NOTICE
Decision filed 07/23/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250094-U

NO. 5-25-0094

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| AARON C. McLEAN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 22-DC-331 |
| | ) | |
| AMY L. McLEAN, n/k/a Amy L. Varel, | ) | Honorable |
| | ) | Tameeka L. Purchase, |
| Respondent-Appellant. | ) | Judge, presiding. |

JUSTICE SHOLAR delivered the judgment of the court.
Justices Cates and Vaughan concurred in the judgment.

**ORDER**

¶ 1     *Held:*  The trial court's judgment regarding parental responsibilities is affirmed where the judgment was not against the manifest weight of the evidence nor an abuse of discretion. The judgment regarding petitioner's AT&T retirement savings account is affirmed where the judgment was not an abuse of discretion. The judgment regarding petitioner's Mastercard savings account is vacated and remanded with directions.

¶ 2     The respondent, Amy McLean (n/k/a Amy Varel), appeals the St. Clair County circuit court's January 22, 2025, judgment of dissolution of marriage. On appeal, she raises two issues for this court's review: (1) whether the trial court incorrectly calculated the marital and nonmarital portions of two of petitioner, Aaron McLean's, 401(k) accounts, and (2) whether the trial court's allocation of parental responsibility was against the manifest weight of the evidence and an abuse

1

of discretion. For the following reasons, we affirm in part, vacate in part, and remand with directions.[1]

¶ 3                                    I. BACKGROUND

¶ 4      We limit our recitation to those facts relevant to our disposition of this appeal. We will recite additional facts in the analysis section as needed to address the specific arguments of the parties. Because the parties shared a last name, we will refer to them by their first names throughout this decision.

¶ 5      Aaron and Amy were married on October 25, 2008. They share three biological children: L.M., born January 1, 2011, E.M., born July 5, 2013, and M.M., born November 2, 2015. On September 14, 2022, Aaron filed a petition for dissolution of marriage. Amy filed a response and counterpetition on September 26, 2022. Following separation, Aaron moved to an apartment in Shiloh, Illinois. Amy remained in the marital home in O'Fallon, Illinois, with the children. On September 29, 2022, the court ordered the parties to participate in mediation in an attempt to resolve the issues of parental responsibility and parenting time.

¶ 6      On January 17, 2023, the trial court entered an agreed temporary nonprejudicial order. The January 17, 2023, order granted sole and exclusive possession of the marital property to Amy. With regard to the allocation of parental responsibilities, the order stated:

"a. Decision-making: The parties shall maintain status quo as to decision-making

responsibilities with regards to the minor children ***.

b. Parenting Time: The children shall primarily reside with Amy, and shall reside

with Amy at all times not otherwise awarded to Aaron herein. Aaron shall have

---

[1]Pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), our decision in this case was due on or before July 7, 2025, absent good cause shown. Both parties sought and were given extensions of time in which to file their briefs. Consequently, we find good cause for issuing a decision after the due date.

parenting time with the children every-other weekend from Friday after school, or at 4:00 p.m. if no school, until Tuesday morning return to school, or 9:00 a.m. if no school, commencing on January 27th, 2023 and every Monday from after school, or 4:00 p.m. if no school, until Tuesday evening at 7:00 p.m."

¶ 7    The January 17, 2023, order further awarded maintenance and child support to Amy, required Aaron to maintain health insurance for the benefit of the parties and the children, ordered that the parties equally divide the children's uncovered expenses and extracurricular expenses, ordered Amy to seek employment and maintain a job search diary, appointed Dr. Kosmicki as the court's psychological evaluator, and ordered Aaron's bonus check to be placed in a joint checking account to be used for Dr. Kosmicki's fees and other agreed-upon child-related expenses. On January 30, 2023, the court entered an order appointing Dr. Pleasant in place of Dr. Kosmicki as the court's psychological evaluator, "to perform a psychological evaluation of the parties and children in accordance with 750 ILCS 5/604.10."

¶ 8    On February 3, 2023, Amy filed a petition to modify the January 17, 2023, temporary order. Amy's petition requested that the trial court modify Aaron's parenting time by awarding him one overnight per week and one evening per week. In support of her petition, Amy argued the children were struggling significantly with extended periods of time with Aaron. Amy included three instances in which the police were called: (1) on January 23, 2023, M.M. ran away from Aaron when he picked her up from Amy's residence; (2) on January 29, 2023, Aaron and L.M. were involved in a physical altercation at Aaron's residence; and (3) on January 30, 2023, L.M. left Aaron's apartment after an argument and walked one mile in freezing temperatures. On February 24, 2023, Aaron filed a response to Amy's petition to modify the January 17, 2023, temporary order. Aaron's response denied the allegations contained in Amy's petition.

3

¶ 9 On February 28, 2023, the trial court held a hearing on pending issues. The trial court (1) ordered the parties to attend coparent/communication counseling; (2) ordered the parties to exchange any bags, sports equipment, or other necessary items needed for Aaron's parenting time by leaving them on the porch of the marital residence; (3) ordered the parties to ensure that the children attended school and all extracurricular activities during their respective parenting time; and (4) ordered the parties not to discuss the litigation or disputes between them with the children.

¶ 10 On February 15, 2024, Amy filed a second petition to modify the January 17, 2023, temporary order. In her second petition, Amy argued there was a substantial change in circumstances warranting a modification of the order. She argued:

> "a. The parties did not follow the January 17th, 2023, [o]rder, from approximately June of 2023 until February of 2024, in that Aaron only exercised parenting time with the younger two children, [M.M.] and [E.M.] every other weekend from Friday through Sunday, and every Tuesday overnight.
>
> b. [Dr. Pleasant] submitted her initial report on June 4th, 2023 and amended report on January 31st, 2024. In the amended report, [Dr. Pleasant] STRONGLY recommended that the parties continue their agreed upon schedule of parenting time with Aaron, which is every other weekend Friday through Sunday evening, and Tuesday overnights with [E.M.] and [M.M.].
>
> c. Dr. Pleasant's report states in pertinent part: 'At this time, there remains too much strife and unresolved issues to expose [E.M.] and [M.M.] by spending more time with Aaron. [E.M.] remains volatile in managing her anxiety and symptoms escalated when either she felt pressured or her desires go ignored.'
>
> d. [E.M.] and [M.M.] suffer serious emotional distress by spending more than two overnights with Aaron, due to his verbal abuse.
>
> e. Although the parties had previously agreed to follow [Dr. Pleasant's] recommendations, Aaron unilaterally began 'enforcing' the January 17th, 2023 Order which caused the girls serious emotional distress, which resulted in [M.M.] not eating and both children being unable to sleep.
>
> f. The girls' counselor and teachers have expressed concerns about the girls' distress when spending long periods of time with Aaron.

4

g. On February 11th, 2024 Amy went to Aaron's residence to pick up the children per the schedule they had been exercising for the past 8 months. However, when Amy appeared, Aaron pushed her which almost caused her to fall down the stairs.

h. On February 13th, 2024 Aaron sent an email to Dr. Bannister, the principal of Moye Elementary, where Amy works and the children attend school, falsely stating that Amy 'harasses' him when he drops the children off at school, and falsely claimed that she used the 'F-word' in front of students.

i. On or about February 11th, 2024, Aaron filed a false police report alleging that Amy hit him.

j. [Aaron's] actions have become increasingly concerning and his mental well-being is deteriorating.

k. [Aaron] refused to follow the court's order as it relates to parenting time with [L.M.]."

As such, Amy argued it was in the best interest of the children to modify Aaron's parenting time by awarding him one overnight per week and every other weekend from Friday to Sunday.

¶ 11   On February 21, 2024, Aaron filed his response to Amy's second petition to modify the January 17, 2023, temporary order. Aaron denied that a substantial change in circumstances occurred since the entry of the January 17, 2023, order. Aaron denied the allegations contained in Amy's petition and asserted affirmative defenses. Specifically, Aaron asserted that since the entry of the court's January 17, 2023, order:

"a. [Amy] has routinely attempted to interfere with [Aaron's] parenting time by unilaterally scheduling events for the children during his parenting time;

b. That [Amy] has continually attempted to interfere with [Aaron's] parenting time by refusing to comply with the Court's Order that she provide the children's personal property in a bag on the front porch of the marital residence for him to pick up. Further, [Amy] has never complied with the provisions of the Order;

c. That [Amy] subjects [Aaron] to regular harassment by confronting him at parenting exchanges in the presence of the minor children, cursing at him and falsely accusing him of misconduct toward the children;

5

d. That [Amy] intentionally refuses to comply with the Court's Order that she provide the children's personal property to him on the parties['] porch at the marital residence so that she can subject him to continual harassment in the presence of the minor children;

e. That [Amy] has appeared at [Aaron's] home demanding return of the children although it was [Aaron's] parenting time;

f. That [Amy] struck [Aaron] on February 11, 2024 because [Aaron] refused to return the children at her insistence."

On February 22, 2024, Amy filed an answer to Aaron's affirmative defenses, denying his allegations.

¶ 12 On March 18, 2024, the trial court held a hearing on Amy's second petition to modify the January 17, 2023, order. Following the hearing, the trial court entered a written order. In its written order, the trial court found there had not been a substantial and significant change in circumstances warranting a modification of the parenting time. Further, the court ordered (1) that the parties comply with the January 17, 2023, order, (2) that the parties ensure the children follow the schedule as ordered, and (3) that the parties do not discuss schedule changes with the children.

¶ 13 Both parties submitted position statements and proposed plans for decision-making and allocation of parenting time. Amy requested sole decision-making responsibility for significant matters. Amy proposed that Aaron's parenting time during the school year be as follows: (1) every other weekend, from Friday after school (or 4 p.m. if there is no school) until Monday morning drop-off at school (or 9 a.m. if there is no school); and (2) every other Monday, following Amy's weekend, from after school (or 4 p.m. if there is no school) until Tuesday morning drop-off at school (or 9 a.m. if there is no school). Aaron requested that he and Amy share the significant decision-making. For his allocation of parenting time, he proposed every other weekend from Friday after school (or 4 p.m. if there is no school) until Wednesday morning drop-off at school

6

(or 9 a.m. if there is no school). Both parties' proposed plans included schedules for holidays and summer vacation time.

¶ 14  The contested matters proceeded to trial on November 6, 2024, November 7, 2024, and December 6, 2024. Amy testified. Amy testified that she lived in O'Fallon, Illinois, at the marital residence and lived there for 14 years. She testified that the children lived with her. She testified that she attended college and received a bachelor's degree in marketing. Amy testified when she and Aaron married in 2008, she worked for a company conducting market research. Amy worked there until 2011 when L.M. was born. From 2011 until 2014, Amy worked seasonally for the same company. Amy testified that she began working again in August of 2023, as a paraprofessional in a special education classroom for first graders, but that she was actively looking for a job in marketing.

¶ 15  Amy testified that in January of 2023, the police were called to Aaron's home "on a couple of occasions related to [L.M.]." After those events, Amy agreed that L.M. would spend more time with Aaron. She stated L.M. spent approximately 50% of the time with Aaron until March of 2024 when the trial court ordered the parties to abide by the January 17, 2023, order. Amy further testified that the daughters (E.M. and M.M.) were terrified of spending the night at Aaron's at first. She stated they felt anxious about separating from her.

¶ 16  Amy further testified as to her interactions and communications with Aaron, the parties' interactions with the children, the children's activities, and the parties' different parenting styles. She testified about an altercation which took place in February of 2024, on Super Bowl Sunday. Amy testified that the parties had not been following the January 17, 2023, order, and she was picking the children up from Aaron's on Sunday evening, as opposed to Monday. However, on that day, Aaron told her she could pick the children up after the Super Bowl concluded. Amy

7

testified she arrived at Aaron's before the game concluded, which resulted in an altercation to which the police responded.

¶ 17 Amy further testified that Dr. Pleasant hoped, as evidenced by her report, that the children would express a desire to spend more time with Aaron and work towards a 50/50 parenting time split. She further testified that Aaron voluntarily adopted Dr. Pleasant's recommended parenting schedule from her June 2023 report. She stated Aaron maintained his reduced parenting time with the girls until January or February of 2024. Amy testified that on multiple occasions, Aaron asked for additional time with the children, but she did not agree.

¶ 18 On cross-examination, Amy testified that following the birth of L.M., the parties made a joint decision that she would stay home with the kids. She stated that following the births of the other two children, Aaron fully supported her staying home to care for the children. Amy testified that in 2021, Aaron mentioned she should resume employment. Amy testified that she was the parent primarily caring for the children from 2011 through the separation. She approximated she was responsible for 85% of parenting duties.

¶ 19 Amy testified that the parties entered into the agreed temporary nonprejudicial order on January 17, 2023. Pursuant to that order, Aaron had parenting time with the children every other weekend from Friday after school until Tuesday morning. During weeks he did not have weekend parenting time, he had overnight parenting time on Monday nights. She testified they followed that schedule until June of 2023. Amy stated on January 23, 2023, M.M. refused to get in Aaron's car which resulted in Aaron calling the police. Amy testified that on January 29, 2023, Aaron and L.M. got into a physical altercation and Aaron called the police for assistance. Amy testified that the following day, L.M. ran away from Aaron's apartment and called Amy to pick him up.

¶ 20    Amy testified that E.M. and M.M. had difficulty with the additional time with Aaron. Amy testified that the girls were used to her parenting 85% of the time and were not used to that much time with Aaron. Amy testified they struggled with the differences in parenting. Amy stated her parenting style is to have open communication and positivity with the children. She stated Aaron is more "rigid."

¶ 21    Amy testified that in June of 2023, the parties began a different parenting time schedule. Under that schedule, the children were with Aaron every other weekend from Friday after school until Sunday at 6 p.m., and every week from Tuesday after school until Wednesday at 9 a.m. (or until school). Amy stated that was the schedule recommended by Dr. Pleasant. Amy stated they followed that schedule for approximately two and a half months. Amy testified that in September of 2023, L.M. began staying with Aaron every other weekend from Friday after school until Wednesday morning. Amy stated that change was a result of compromise, because Aaron believed they should revert back to the trial court's January 17, 2023, schedule. She stated the girls continued to follow Dr. Pleasant's schedule.

¶ 22    Amy testified they followed the modified schedule until Super Bowl Sunday of 2024, when Aaron unilaterally decided he was no longer going to follow that schedule. Amy further testified that she believed Aaron's request for parenting time was an effort to pay less in child support.

¶ 23    Amy testified that she and Aaron struggle with communication regarding decision-making. Amy stated that prior to separation, she made the majority of the decisions, she took the children to doctors' appointments, she typically attended parent/teacher conferences and that Aaron attended approximately 5% of the conferences. Amy testified that she enrolled the children in their extracurricular activities. Amy testified that Aaron believed the children should not be involved in so many extracurricular activities. Amy provided examples of the difficulties she faced in

9

scheduling medical appointments and extracurriculars for the children because of her and Aaron's inability to cooperate. Amy stated she was seeking sole decision-making authority but that she would involve Aaron in the decision-making process.

¶ 24     Amy testified as to her proposed division of the parties' assets. She testified as to the existence of Aaron's AT&T retirement savings plan as well as the existence of his AT&T pension. Amy acknowledged that a portion of both accounts was earned prior to the parties' marriage. Amy also testified that she requested the trial court to order Aaron to contribute to her attorney fees.

¶ 25     Dr. Pleasant next testified as the trial court's witness. Both parties stipulated to her qualification as an expert witness and questioned her. Dr. Pleasant testified that she performed three evaluations. The initial report was dated June 4, 2023, a first addendum was dated January 31, 2024, and a second addendum was dated October 27, 2024.

¶ 26     For the second addendum, Dr. Pleasant testified that she interviewed Amy on October 11, 2024, and October 14, 2024. Dr. Pleasant further testified she interviewed M.M. and E.M. on October 14, 2024. Dr. Pleasant testified that Aaron chose not to be interviewed for the second addendum. She stated she did not interview L.M. for the second addendum because she presumed his response would be "an exact match" from the interview prior. She stated in the prior interview, L.M. told her everything was "fine." Dr. Pleasant testified that one of her biggest concerns, as highlighted in the summary of her second addendum, was M.M. and E.M.'s emotional distress. Dr. Pleasant stated:

> "I truly want for these parents to be able to exercise co-parenting and to get to the point where we can exercise a fifty/fifty split, I truly do because I think that is in the best interest of the children to have healthy parenting and healthy boundaries on both sides. So that's kind of the goal and the objective, absolutely. But at this given point you know I just think the issue that I have was the extensive period of time from the Friday to Tuesday evening, the lengthy period of time."

¶ 27    Dr. Pleasant testified that when she interviewed the children in Aaron's presence, she witnessed him interact with the children and that it was an "exceptional experience." Dr. Pleasant testified she interviewed third parties that reported Amy and Aaron were good parents.

¶ 28    Dr. Pleasant confirmed that initially, her recommendation was that Amy have sole decision-making and primary parenting time with E.M. and M.M., and that Aaron have sole decision-making and primary parenting time with L.M. Dr. Pleasant testified that her latest report recommended Amy have the majority of parenting time and sole decision-making for all three children. She testified that Aaron was not exercising a level of flexibility in communicating with Amy and the children on certain issues. Dr. Pleasant concluded that she had concerns about Aaron regarding his ability to accurately understand a situation or circumstance.

¶ 29    Dr. Pleasant was next examined by Amy's counsel. Dr. Pleasant testified that on January 30, 2023, she was appointed to perform psychological evaluations of the parties and the children. Dr. Pleasant testified that she provided her first report on June 4, 2023. In preparing that report, Dr. Pleasant stated she met with both parties separately to gather data and to understand their perception of the issues. She stated she met with all three children at both Amy and Aaron's residences. Dr. Pleasant testified she notified the parties that they could provide her with any documents they wanted her to consider. Dr. Pleasant testified she interviewed a list of collateral witnesses provided by the parties. She further testified that she conducted psychological evaluations of the parties and children.

¶ 30    Dr. Pleasant testified that in her June 4, 2023, report, she recommended Aaron have shorter increments of parenting time. Specifically, she recommended Aaron have parenting time alternating Friday evenings through Sunday evening and every Tuesday night. She stated her recommendation for shorter periods of time was so Aaron would not be so stressed out by juggling

11

the children's schedules and dealing with the girls' separation and anxiety related issues. With regard to decision-making, Dr. Pleasant's June 4, 2023, recommendation was that the parties have joint decision-making.

¶ 31    Dr. Pleasant testified that she was asked to provide an addendum to her report. The addendum was dated January 31, 2024. She stated that in preparation of this report, she interviewed the children in person and the parties by phone. In her addendum, with regard to parenting time, Dr. Pleasant made the same recommendation as her initial report—that Aaron have parenting time every other weekend, Friday evening through Sunday evening, and every Tuesday. Dr. Pleasant testified that the basis of her recommendation was that she did not see any progress with respect to Aaron. Specifically, she stated she did not see Aaron change his rhetoric in supporting his daughters in their growth and development and dealing with their anxiety levels. Dr. Pleasant testified it was in "their best psychological interest" for them to "kind of go back to where they were at a good sounding point." With regard to decision-making, Dr. Pleasant recommended that Amy be awarded sole decision-making. She testified the basis of her recommendation was that the parties were not making progress with their abilities to coparent. Dr. Pleasant testified the parties were not coparenting effectively.

¶ 32    Dr. Pleasant testified that she supplemented her report with a second addendum, dated October 27, 2024. Dr. Pleasant testified that in preparation for the second addendum, she interviewed Amy and the children. She did not interview Aaron. According to Dr. Pleasant, Aaron chose not to speak with her. Dr. Pleasant also testified that she interviewed E.M. and M.M.'s counselor, Sheri Miller.

¶ 33    Dr. Pleasant testified that in her second addendum, with regard to parenting time, she again recommended Aaron have parenting time every other weekend, Friday through Sunday, and every

12

Tuesday during the school year when there is not a long weekend. She testified that she recommended Aaron receive extended parenting time to take the children on trips to see family on long weekends. Dr. Pleasant testified that in her second addendum, she recommended Amy have sole decision-making of the children. She testified the basis of her recommendation was the parties' inability to coparent.

¶ 34 Aaron was called to testify. On direct examination, he testified he lived in a two-bedroom apartment in Shiloh. He moved there following separation of the parties. Aaron testified that before he moved out, he and Amy "agreed to split the kids fifty/fifty." He stated that after he moved out, that changed, and he "didn't really get to see the kids for about four months." Aaron testified that Amy would let L.M. stay over but would not let the girls stay.

¶ 35 Aaron testified that prior to the separation, he was a cub scout leader for the children, an assistant baseball coach for L.M., an assistant softball coach for E.M., and he took the children to their events. Aaron testified that he did not agree with Amy's testimony that she provided 85% of the care for the children prior to separation.

¶ 36 Aaron testified that the separation was difficult for the children. He testified he and L.M. are "back to where [they] were before" and the girls are "back to being themselves." Aaron testified that under the January 17, 2023, parenting time order, the kids have straight A's and "they're flourishing." He testified that he did not think Dr. Pleasant's proposed parenting time would work well. Aaron stated, "[W]e'd go back to the kids not being in school as often. I think things would suffer if we went back."

¶ 37 Aaron testified that he was employed with AT&T from February of 1999 until March of 2021, at which time he accepted a position with Mastercard. He was employed with Mastercard until November 19, 2024, but would receive severance pay until March 9, 2025. Aaron testified

13

he understood that all of the money that he earned while employed by Mastercard was marital property. Aaron testified that he paid maintenance and child support based upon his base pay since February of 2023. He testified that he wished for the court to award him his contributions and his employer's contributions to his Mastercard 401(k) account made during that time period.

¶ 38   Aaron testified to the existence of a 401(k) account from AT&T which included a pension rollover of approximately $275,000. Aaron stated the pension was from his years of service at AT&T before the marriage. Aaron stated he understood the marital portion of that account should be divided between the parties. Aaron testified that he asked the court to divide the account proportionally based on the amount of time spent with AT&T prior to the marriage versus during the marriage.

¶ 39   The trial court took the matter under advisement and directed the parties to submit written closing arguments and proposed judgments. The court issued its judgment of dissolution of marriage on January 22, 2025. In its judgment, relevant to this appeal, the court first made an allocation of parental responsibilities, namely, decision-making and parenting time. For decision-making, the court considered the best interest factors contained in section 602.5 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/602.5 (West 2022)). The court found that it was in the best interests of the children that the parties share joint responsibilities for decision-making in all areas of responsibilities.

¶ 40   With regard to parenting time, the trial court considered the factors set forth in section 602.7(b) of the Act (*id.* § 602.7(b)). The court found "based upon the totality of the evidence that both parties are fit and proper parents and are capable of sharing parenting time equally with their children." The court modified the existing parenting time schedule to award Aaron parenting time on alternate weekends from Friday at 4 p.m. (or after school), until Wednesday morning until

14

return to school (or 9 a.m.). During weeks in which he did not have parenting time on the weekend, the court awarded Aaron parenting time from Monday after school (or 4 p.m.) until Wednesday morning return to school (or 9 a.m.).

¶ 41    In its January 22, 2025, judgment, the trial court divided the parties' retirement accounts. Relevant to this appeal, the court found Aaron had a 401(k) account through his employment with Mastercard, valued at $133,617. The court found that account was entirely marital. The court found that Aaron paid maintenance in the amount of $3,408 per month for the period of February 1, 2023, through and including September 2024. During that time period, Aaron's contributions and his employer's matching contributions totaled $54,880.31. The court deducted the $54,880.31 from the Mastercard 401(k) account before dividing the account, stating, "The funds contributed to the 401K account have already been considered as income for support purposes and are therefore awarded to Aaron."

¶ 42    The trial court also found that Aaron had a retirement savings plan from his prior employment with AT&T. The court found the total value of the account was $883,727.46. The court found that Aaron's total days of employment with AT&T were 8,059.[2] His nonmarital days of employment with AT&T were 3,545 (44%); his days of marital employment were 4,415 (56%). The court stated:

> "The court finds that the 'Hunt Formula' shall apply. [44%] of the AT&T Retirement Savings [Plan] is assigned to Aaron as his non-marital property and the remaining 56% is divided equally between the parties. The division is plus or minus gains or losses subsequent to the entry of this order."

¶ 43    On February 7, 2025, Amy filed her timely notice of appeal.

---

[2]The trial court's judgment mistakenly says 4,415 days. Amy's brief says 4,515 days. Based on our calculation, there were 4,514 days from October 25, 2008, to March 5, 2021.

¶ 44                                    II. ANALYSIS

¶ 45    On appeal, Amy argues that (1) the trial court incorrectly calculated the marital and nonmarital portions of two of Aaron's 401(k) accounts, and (2) the court's allocation of parental responsibility was against the manifest weight of the evidence and an abuse of discretion. Specifically, Amy argues that the trial court erred by calculating the marital component of Aaron's AT&T retirement savings plan. She also argues that the trial court erred in calculating the marital component of Aaron's Mastercard savings plan. Lastly, Amy argues the trial court's allocation of joint decision-making and the increase in Aaron's parenting time were against the manifest weight of the evidence and an abuse of discretion. For the following reasons, we affirm in part and vacate in part.

¶ 46                   A. Calculation of AT&T Retirement Savings Plan

¶ 47    We first address Amy's argument that the trial court erred in its calculation of Aaron's AT&T retirement savings plan. At the outset, we note that the parties present arguments related to the *classification* of the AT&T retirement savings account as marital or nonmarital. However, in the January 22, 2025, judgment of dissolution, the trial court stated, "The parties agree that a portion of the plan is non-marital as Aaron began his employment prior to the marriage." Further, the order reads, "Both parties agree that the non-marital portion should be assigned to Aaron." In Amy's brief, she states, "There is no dispute that the pre-marriage portion of this asset is non-marital[.]" Aaron's brief emphasizes the same language. Therefore, we find that the classification of the AT&T savings account as marital or nonmarital is not at issue.

¶ 48    Rather, the parties disagree as to the proper apportionment and distribution of the account. Our review of the record demonstrates that Aaron's AT&T account constituted both marital and

16

nonmarital property, where Aaron began his employment there prior to the marriage and continued his employment during the marriage. Therefore, we consider whether the trial court properly distributed the AT&T account.

¶ 49    The parties disagree as to the proper standard of review. Amy contends that because the issue of whether the formula set forth in *In re Marriage of Hunt*, 78 Ill. App. 3d 653 (1979), applies to the AT&T account is one of law, our review is *de novo*. She cites to *In re Marriage of Wendt*, 2013 IL App (1st) 123261, ¶¶ 15-16, in support of her contention. Aaron argues that the distribution of marital assets will not be disturbed absent an abuse of discretion, citing to *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 34.

¶ 50    The sole issue before this court is the distribution of the AT&T account. The distribution of marital property lies within the sound discretion of the circuit court, and we will not disturb its judgment on review absent an abuse of discretion. *In re Marriage of Eidson*, 235 Ill. App. 3d 907, 911 (1992). An abuse of discretion occurs when the decision was " ' clearly against logic.' " *In re Marriage of Munger*, 339 Ill. App. 3d 1104, 1107 (2003) (quoting *State Farm Fire & Casualty Co. v. Leverton*, 314 Ill. App. 3d 1080, 1083 (2000)). "[T]he question is whether the trial court made an arbitrary decision, without using conscientious judgment, or whether, in view of all of the circumstances, the trial court overstepped the bounds of reason, ignored the law, and thereby caused substantial prejudice to the appellant." *Id.* "A reviewing court applies the manifest weight of the evidence standard to the factual findings for each factor on which a trial court may base its property disposition, but it applies the abuse of discretion standard in reviewing the trial court's final property disposition (and how the trial court considers those factors)." *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 205 (2005).

¶ 51     The disposition of property in a dissolution of marriage proceeding is governed by section 503 of the Act (750 ILCS 5/503 (West 2022)). Before a court may dispose of property upon the dissolution of marriage, it must determine whether the property is marital or nonmarital. *In re Marriage of Henke*, 313 Ill. App. 3d 159, 166 (2000). After the trial court classifies the property as marital or nonmarital, it awards each spouse his or her nonmarital property and divides the marital property into just proportions. 750 ILCS 5/503(d) (West 2022). In dividing marital property, the distribution by the court need not be equal so long as it is equitable. *In re Marriage of Werries*, 247 Ill. App. 3d 639, 649 (1993).

¶ 52     Under the Act, there is a rebuttable presumption that all property acquired by either spouse after the marriage and before a judgment of dissolution of marriage is marital property. 750 ILCS 5/503(b)(1) (West 2022); *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 45. Similarly, section 503(b)(2) of the Act provides that "all pension benefits (including pension benefits under the Illinois Pension Code, defined benefit plans, defined contribution plans and accounts, individual retirement accounts, and non-qualified plans) acquired by or participated in by either spouse after the marriage and before a judgment of dissolution of marriage *** are presumed to be marital property." 750 ILCS 5/503(b)(2) (West 2022). These presumptions may be overcome by a showing of clear and convincing evidence that the property falls within one of the exceptions listed in section 503(a) of the Act. *Id.* § 503(a); *Romano*, 2012 IL App (2d) 091339, ¶ 45.

¶ 53     The parties present arguments regarding who has the burden of "tracing" the contributions of the marital funds into the AT&T account. We find tracing is not at issue. Rather, the issue properly before us on appeal is how to distribute the AT&T account. The parties do not dispute the trial court's calculation that 44% of Aaron's days spent working for AT&T were before the marriage and the remaining 56% of the days working for AT&T were during the marriage.

18

¶ 54    Aaron was employed by AT&T from February 11, 1999, to March 5, 2021. The parties were married on October 25, 2008. When Aaron retired from AT&T on March 5, 2021, he opted to receive his AT&T pension benefit as a lump sum of $274,957.77, which he rolled over into the AT&T retirement savings account. The trial court valued the retirement savings account at $883,727.46. In its January 22, 2025, judgment, the trial court found that the formula set forth in *In re Marriage of Hunt*, 78 Ill. App. 3d 653 (1979), applied. The court assigned Aaron 44% of the AT&T retirement savings account as his nonmarital property and divided the remaining 56% equally between the parties.

¶ 55    Both parties agree that the value of the AT&T account at the time of marriage is Aaron's nonmarital property. See 750 ILCS 5/503(a)(6) (West 2022). The primary dispute in this case is how to treat the increase in the value of the account during the marriage. Any increase in the value of Aaron's premarital contributions would be nonmarital, as well. *Id.* § 503(a)(7). Pension benefits attributable to contributions during the marriage are marital property. *In re Marriage of Smith*, 102 Ill. App. 3d 769, 772 (1981). A trial court's method of determining the marital interest in a pension will only be reversed if it constitutes an abuse of discretion. *In re Marriage of Blazis*, 261 Ill. App. 3d 855, 863 (1994).

¶ 56    The *Hunt* formula, or proportionality rule, is "widely accepted by Illinois courts in allocating the division of unmatured pension interests." *In re Marriage of Richardson*, 381 Ill. App. 3d 47, 52 (2008). Under the *Hunt* formula, "the marital interest in a pension benefit is determined by dividing the number of years or months of marriage during which pension benefits accumulated by the total number of years or months benefits accumulated prior to retirement or being paid." *Id.* "The value of the marital interest is then calculated by multiplying the amount of each benefit payment as it is disbursed by the marital interest percentage." *Id.*

19

¶ 57 The trial court calculated the marital portion of Aaron's AT&T retirement savings account by utilizing the *Hunt* formula: (4,514 days employed by AT&T during the marriage)/(8,058 days of total employment with AT&T) = 56%. We note, however, that the trial court's judgment mistakenly says 4,415 days employed during the marriage. Amy's brief says 4,515 days. Based on our calculation, there were 4,514 days from October 25, 2008, to March 5, 2021. Nonetheless, the court properly assigned 44% of the AT&T retirement savings plan to Aaron as his nonmarital property.

¶ 58 Amy argues that the *Hunt* formula does not apply to determine the benefits of a defined contribution plan such as Aaron's AT&T retirement savings plan. She argues that she "did not find a single reported case where the *Hunt* formula was applied to a 401(k) account such as this." Further, she argues the *Hunt* formula should only be applied to pensions or similar assets. However, in *Hunt*, the husband had interests in both his employer's pension and profit-sharing plans and the court's holding applied to both plans. *Hunt*, 78 Ill. App. 3d at 655, 663-64. The court in *Hunt* did not specify whether the profit-sharing plan was a defined benefit or defunded contribution plan. Generally, a profit-sharing plan is a type of defined contribution plan. *In re Jacobs*, 403 B.R. 565, 578 (N.D. Ill. 2009). Thus, *Hunt* appears to apply the same formula to both types of plans. Further, we note that section 503(d)(2) of the Act includes "defined contribution plans and accounts" in its definition of "pension benefits." As such, we cannot conclude that the court erred by utilizing the *Hunt* formula to determine the marital portion of the AT&T retirement savings plan.

¶ 59 Amy argues that the trial court should have only applied the *Hunt* formula to the lump sum pension rollover ($274,957.77) to determine the nonmarital and marital portions of that amount.

20

She argues the remainder of the account should have been divided equally between the parties. We disagree.

¶ 60    In this case, the trial court was presented with competing methods of valuation by the parties. We cannot find that the chosen method of apportionment was an abuse of discretion. "[T]he question is whether the trial court made an arbitrary decision, without using conscientious judgment, or whether, in view of all of the circumstances, the trial court overstepped the bounds of reason, ignored the law, and thereby caused substantial prejudice to the appellant." *Munger*, 339 Ill. App. 3d at 1107. As such, we affirm the trial court's calculation and distribution of the AT&T retirement savings plan.

¶ 61                              B. Calculation of Mastercard Savings Plan

¶ 62    Amy next argues that the trial court erred in its calculation of Aaron's Mastercard savings plan. Specifically, Amy argues the trial court erred by deducting $54,880.31 from the Mastercard account and awarding that amount to Aaron based on the argument that it had been constructively included in Amy's maintenance and child support payments. Our review of the record demonstrates that Aaron's Mastercard retirement account constituted entirely marital property. In fact, the parties do not dispute that the Mastercard retirement account is entirely marital property. Thus, we consider whether the trial court properly divided the Mastercard account. As noted above, the distribution of marital assets will not be disturbed absent an abuse of discretion. *Hamilton*, 2019 IL App (5th) 170295, ¶ 34.

¶ 63    In its January 17, 2023, order, the trial court ordered Aaron to pay temporary maintenance to Amy in the amount of $3,408 per month. The court also ordered Aaron to pay temporary child support to Amy in the amount of $1,722 per month. In its January 22, 2025, judgment, the court found Aaron had a 401(k) account through his employment with Mastercard valued at $133,617.

21

The court's January 22, 2025, judgment states, "The funds contributed to the 401K account have already been considered as income for support purposes and are therefore awarded to Aaron." Aaron argues the trial court did not err by deducting $54,880.31 from the Mastercard account because it had been constructively included in Amy's maintenance and child support payments from February 1, 2023, to September 2024. Aaron argues that section 503(d) of the Act permits the trial court to consider each party's contribution to the acquisition or the increase in value of marital property, and whether such a contribution occurred after the filing of the proceedings.

¶ 64    Temporary maintenance may be awarded pursuant to section 501(a)(1) of the Act (750 ILCS 5/501(a)(1) (West 2022)). Trial courts have wide latitude in awarding temporary maintenance and such awards may not be reversed absent an abuse of discretion. See *In re Marriage of Greenberg*, 102 Ill. App. 3d 938, 941 (1981).

¶ 65    As noted above, the Act governs the procedures for the dissolution of marriage including the distribution of marital property. 750 ILCS 5/101 *et seq.* (West 2022). Section 503(a) of the Act requires a trial court to classify property as either marital or nonmarital prior to allocating the property. *Id.* § 503(a). Once the property is classified as marital or nonmarital, section 503(d) of the Act provides that marital property shall be divided in "just proportions" upon consideration of "all relevant factors," including various factors specifically enumerated in the Act. *Id.* § 503(d). The distribution of marital assets will not be disturbed absent an abuse of discretion. *Hamilton*, 2019 IL App (5th) 170295, ¶ 34.

¶ 66    Aaron was employed by Mastercard from March 2021 until his employment was terminated, effective November 19, 2024. He continued to receive his salary as severance until March 9, 2025. While employed by Mastercard, Aaron made voluntary contributions to a Mastercard savings plan, a 401(k) account.

¶ 67    Amy argues that, in calculating maintenance and child support, Aaron was not entitled to a deduction for voluntary contributions to his Mastercard account. Amy argues that the court essentially took certain income that Aaron voluntarily transferred to his 401(k) account after February 1, 2023, and reclassified it as maintenance or child support, including contributions from Mastercard. The court returned that amount to him as nonmarital property. Amy argues this represents an abuse of discretion. We agree. Aaron voluntarily transferred a portion of each paycheck from February 1, 2023, to September 2024 into his Mastercard account. These funds were marital property. See 750 ILCS 5/503(a) (West 2022) (marital property means all property acquired subsequent to the marriage).

¶ 68    Further, we note that the January 17, 2023, order establishing temporary maintenance was an "agreed" order. The court ordered Aaron to pay $3,408 per month according to the statutory guidelines based on his 2023 income. In deducting the $54,880.31 from the balance of the Mastercard account, the trial court retroactively reduced the amount Aaron agreed to pay Amy for that time period. We find this was in error. "The party seeking modification of a maintenance order has the burden of persuading the trial court that a change in maintenance is justified." *In re Marriage of Dunseth*, 260 Ill. App. 3d 816, 827 (1994). "A change in maintenance is justified only where the moving party can demonstrate a 'substantial change in circumstances.' " *Id.*

¶ 69    For these reasons, we find that the trial court erred by deducting $54,880.31 from the Mastercard account and awarding that amount to Aaron. Accordingly, we vacate this portion of the judgment of dissolution and remand with directions for the trial court to allocate the Mastercard account in light of these principles. Specifically, we direct the trial court to divide the full balance of the account equally between the parties. Since we find that the court erred, we need not address any remaining issues regarding the Mastercard account.

¶ 70                    C. Allocation of Parental Responsibilities: Decision-Making

¶ 71    Amy next argues that the trial court's allocation of decision-making was against the manifest weight of the evidence and an abuse of discretion. Specifically, she argues the court erred by finding that it was in the best interests of the children that the parties share joint responsibilities for decision-making in all areas of responsibilities. For the reasons that follow, we disagree.

¶ 72    A trial court "shall allocate decision-making responsibilities according to the child's best interests." 750 ILCS 5/602.5(a) (West 2022). In making that decision, the court must consider all relevant factors including:

> "(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;
>
> (2) the child's adjustment to his or her home, school, and community;
>
> (3) the mental and physical health of all individuals involved;
>
> (4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making;
>
> (5) the level of each parent's participation in past significant decision-making with respect to the child;
>
> (6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;
>
> (7) the wishes of the parents;
>
> (8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be relevant." *Id.* § 602.5(c).

¶ 73　An appellate court will not disturb a trial court's ruling on the allocation of decision-making responsibilities unless the decision is against the manifest weight of the evidence. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47 (citing *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 64). " 'A decision is against the manifest weight of the evidence when an opposite conclusion is apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on evidence.' " *Id.* (quoting *In re Marriage of Verhines*, 2018 IL App (2d) 171034, ¶ 51).

¶ 74    The circuit court is not required to make explicit findings on each factor, nor is it required to refer to every factor. *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991). "In child custody cases, there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child." *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 25.

¶ 75    Amy argues that the trial court's decision was against the manifest weight of the evidence where the trial court erred by "completely rejecting Dr. Pleasant's report and overlooking the undisputed evidence inconsistent with its order." We disagree.

¶ 76    In allocating decision-making in its January 22, 2025, judgment, the trial court addressed each factor contained in section 602.5 of the Act before ordering the parties to "share joint responsibilities for decision making in all areas of responsibilities." In addressing each factor, the court set forth specific examples from the evidence and testimony.

¶ 77    First, the trial court addressed the wishes of the children and stated "[n]o evidence was presented by either party as to a preference expressed by the children as to decision making." The court next considered the children's adjustment to his or her home, school, and community. The court stated both parties resided in the same school district and intend for the children to continue to attend school in the O'Fallon School District. The court stated that all three children were good students and were active in extracurricular activities. The court relied on Aaron's testimony that he was actively involved with the children, including coaching sports and serving as a scout leader. The court next considered the mental and physical health of the individuals involved, and determined that this factor did not favor either party.

¶ 78    The trial court next considered the ability of the parents to cooperate. The court stated that it considered the testimony at trial and acknowledged the disputes between the parties. The court

26

found it "apparent that both of the parents have the ability to make major decisions for the children." As a result, the court found this factor did not favor either parent. Next, the court considered the level of each parent's participation in the past significant decision-making. The court concluded that prior to the separation the parties shared in decision-making. The court considered the factor of "any prior agreement or course of conduct between the parties relating to decision-making" and reiterated its findings for the previous factor.

¶ 79    The trial court considered the wishes of the parents and stated, "Amy desires sole decision making in all areas of responsibility. Aaron desires that the parties be granted joint decision-making." The court considered the children's needs and concluded that both parents worked to assure that the children's needs were met. The court considered the distance between the parents' residences, transportation, the parents' and children's daily schedules, and the ability of the parents to cooperate in the arrangement. The court found "there is no significant distance between the parties." In considering whether a restriction on decision-making was appropriate under section 603.10, the court did "not find cause for a restriction of decision-making."

¶ 80    The trial court next considered "[t]he willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." The court stated, "This factor is of great concern to the court." The court opined that both parties "engaged in conduct which has not been supportive of the other parent." The court recounted certain events as described by the parties at trial and concluded "[a]ll of these events give the court pause as to both parties' ability to put their animosity aside moving forward."

¶ 81    The trial court weighed the factor of "physical violence or threat of physical violence by the children's parent directed against the child" and stated, "The court is unaware of any threat of violence directed against the children in this matter." The court considered "[t]he occurrence of

27

abuse against the child or other member of the child's household." The court stated, "Other than the Super Bowl Sunday event no other evidence of events had been elicited." The court considered "[w]hether one of the parents is a sex offender" and found that factor was not an issue.

¶ 82    The evidence presented at trial demonstrated that the parties had a toxic relationship. The trial court noted in its judgment that "[t]here have been disputes between the parties and difficulties communicating between the parties that have been occasioned by both parties and their differing parenting styles and the evident lack of desire by both parties to cooperate with the other." The court further opined "there have not been any major disputes regarding school, healthcare or extra-curricular activities. All the children have received appropriate medical care, and all have continued to engage in their extra-curricular activities." The court emphasized that Dr. Pleasant testified "if one of the parties were awarded sole decision making regarding any of the major decision-making areas then the other party would likely be excluded from that decision making." The court stated it did not believe that such a result is appropriate or necessary.

¶ 83    It is no small burden to show that a trial court's allocation of decision-making responsibilities is against the manifest weight of the evidence. *Agers*, 2013 IL App (5th) 120375, ¶ 25 (holding "there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child"). It is apparent that the trial court in this case thoroughly reviewed the applicable statutory factors in assessing the evidence. Under these circumstances, where the court explicitly considered all pertinent statutory factors, we find that the circuit court's ruling on decision-making responsibilities is not against the manifest weight of the evidence.

¶ 84                    D. Allocation of Parental Responsibilities: Parenting Time

¶ 85    Lastly, Amy argues the trial court's allocation of parenting time was against the manifest weight of the evidence and an abuse of discretion. Specifically, she argues the court erred by increasing Aaron's parenting time. We disagree.

¶ 86    A trial court must allocate parenting time according to the best interests of the child. 750 ILCS 5/602.7(a) (West 2022). The court must consider all relevant factors, including:

"(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." *Id.* § 602.7(b).

¶ 87 A reviewing court will not disturb a trial court's allocation of parenting time unless " 'it is against the manifest weight of the evidence, is manifestly unjust, or is the result of an abuse of

30

discretion.' " *Jameson*, 2020 IL App (3d) 200048, ¶ 53 (quoting *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21).

¶ 88    At the time of trial, the parties were following the trial court's January 17, 2023, temporary parenting time order. Under that order, Aaron had parenting time every other weekend from Friday after school (or 4 p.m.), until Tuesday morning return to school (or 9 a.m.) and Monday from after school (or 4 p.m.), until Tuesday evening at 7 p.m. on alternate weeks. In its judgment following trial, the court modified the parenting time schedule to award Aaron parenting time on alternate weekends from Friday after school (or 4 p.m.) until Wednesday morning until return to school (or 9 a.m.). During weeks in which he did not have parenting time on the weekend, the court awarded Aaron parenting time from Monday after school (or 4 p.m.) until Wednesday morning when the children return to school (or 9 a.m.).

¶ 89    In allocating parenting time, in its January 22, 2025, judgment, the trial court considered each factor contained in section 602.7(b) of the Act. The court considered the wishes of each parent and noted Aaron sought an increase in his parenting time, resulting in an equal division of parenting time. The court noted that Amy sought a reduction in Aaron's parenting time. The court next weighed the wishes of the children and stated, "The court did not hear any testimony from the children as to their desires regarding parenting time."

¶ 90    The trial court next considered "[t]he amount of time each parent spent performing caretaking functions with respect to the [children]" and stated that the court addressed this factor under decision-making. With respect to "[a]ny prior agreement or course of conduct between the parties relating to caretaking functions with respect to the [children]," the court stated it was unaware of any such agreement. The court next considered "[t]he interaction and interrelationship of the [children] with [their] parents and siblings or any other persons having significantly affected

31

the [children's] best interest[s]." The court found that based on the testimony, the children have a good relationship with both parents. The court stated, "It is unusual for the court to be in a position where an evaluator has indicated that someone is a 'great parent' and that someone has provided an exceptional environment for the children and yet that witness has recommended what the court can only quantify as limited parenting time." The court concluded that it was in the children's best interest to limit their parents' contact at exchanges.

¶ 91    The trial court next considered the children's adjustment to their home, community, and school. The court noted that the parties testified they intend for the children to continue to attend school in the O'Fallon School District. The court further noted the children were good students and were involved in extracurricular activities. With regard to factors 7 through 11, the trial court noted these factors were addressed under the decision-making analysis of its order, as stated above.

¶ 92    The court next considered the factor of "[t]he willingness and the ability of each parent to place the needs of the child ahead of his/her own needs." The court found "[b]oth of these parents have the ability to appropriately parent these children as they have done prior to the filing of this litigation." With respect to "[t]he willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child," the trial court stated the "parents in this matter are both well-educated and well able to place the needs of the children above their own." The court found factors 14 through 16 not applicable. Lastly, the trial court considered "[a]ny factor that the court expressly finds to be relevant." The court stated it "cannot ignore the inconsistencies in the report provided by Dr. Pleasant nor in the testimony offered at trial." The trial court emphasized the factors contained in section 602.7(b)(1) through (b)(8), (b)(12), (b)(13), and (b)(17). The court found, "based upon the totality of the evidence that both

32

parties are fit and proper parents and are capable of sharing parenting time equally with their children."

¶ 93    In arguing that the trial court's decision regarding parenting time was against the manifest weight of the evidence, Amy contends that the court erred by not following Dr. Pleasant's recommendations. The court found, however, that Dr. Pleasant's report contained inconsistencies with the testimony offered at trial. The majority of the testimony presented at trial was disputed by the other party. We find no reason in the record to disturb the court's credibility determinations. See *Young*, 2018 IL App (4th) 170001, ¶ 64. The evidence indicated that both parties were fit to parent. Amy's argument essentially asks this court to reweigh the evidence and credibility of the witnesses. We decline to do so. There is no indication from the record that the trial court failed to consider any of the relevant statutory factors, or the evidence presented on those factors, in reaching its decision on parenting time. For the foregoing reasons, we find that the trial court's parenting-time decision was not against the manifest weight of the evidence.

¶ 94                                    III. CONCLUSION

¶ 95    The judgment of the trial court of St. Clair County is affirmed in part, vacated in part, and remanded with directions.

¶ 96    Affirmed in part, vacated in part, and remanded with directions.