2026 IL App (1st) 250330-U

SECOND DIVISION
April 14, 2026

No. 1-25-0330

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| IN RE PARENTAGE OF R.C. and E.C.: | ) | |
| | ) | Appeal from the |
| SHARON SELEB, | ) | Circuit Court of |
| | ) | Cook County |
| Petitioner-Appellant, | ) | |
| | ) | 13 D 80410 |
| v. | ) | |
| | ) | Honorable |
| SCOTT CLARK, | ) | Rosa M. Silva, |
| | ) | Judge Presiding |
| Respondent-Appellee. | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and D.B Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Decision to allow joint decision-making and equal parenting time was not against manifest weight of evidence.

¶ 2    After years of litigation, Sharon Seleb and Scott Clark, unmarried parents of two children, entered into an agreed allocation of parental responsibility in 2019. The agreed judgment included 50/50 parenting time and joint decision-making authority over all decisions but education, which was granted solely to Scott.

¶ 3    In 2021, Scott moved to Michigan and Sharon filed a petition to modify the agreed judgment. The court modified the judgment to give Sharon the vast majority of parenting time.

Then Scott returned to Chicago and ultimately requested that his equal parenting time be restored. The court reimposed the original agreement on parenting time, returning Scott's share to fifty percent. Sharon appeals that judgment.

¶ 4    Sharon also requested sole decision-making authority over all major decisions involving the child. The court denied that request but did, for the first time, give Sharon equal decision-making authority over education decisions for the children. Sharon appeals that judgment, too.

¶ 5    We find no error in the court's rulings and affirm.

¶ 6                              BACKGROUND

¶ 7     Sharon and Scott were never married and had two children: one born in 2013, the other in 2016. While he is healthy now, the younger child was born premature and required extremely intensive care for the first few years of his life due to issues with his lungs.

¶ 8    The parties had a stormy relationship even before the birth of the first child; they each sought sole custody of their firstborn in 2013 before eventually agreeing to joint custody. Their attempts at reconciliation were spotty and short-lived, but they did result in the birth of a second child in 2016. We need not wade into the full history. Suffice it to say that, after years of back-and-forth litigation, including several motions for contempt, the court finally entered an Agreed Allocation Judgment (AAJ) in April 2019.

¶ 9    Relevant to this appeal, the AAJ provided that the parties agreed to a "2-2-3" parenting schedule during the school year—meaning, essentially, that one parent had the kids Monday to Wednesday, the other Wednesday to Friday, and they alternated weekends. During the summer, the parents alternated full weeks. All parental decision-making was joint with the exception of education decisions, where Scott had sole authority. Almost immediately after the entry of the

AAJ, the contentiousness between Sharon and Scott erupted again, each filing motions to compel and accusing the other of violating various orders and rulings of the court, including the AAJ.

¶ 10     This pattern continued until October 2021, when Scott moved to Michigan with his wife, Jade, and their son. (Scott and Jade met and were married at some point after Scott's and Sharon's children were born.) In response, Sharon filed a petition to modify parental responsibilities—actually two motions: an October 20 *emergency* motion to modify parenting time and an October 26 petition to fully modify the AAJ.

¶ 11     In early November, the court granted Sharon's emergency motion. Per the order, "[c]ommencing November 19, 2021, Scott shall have regular parenting time every other weekend, which shall be defined as Friday (pick up after school) to Sunday by 5:00 p.m." The court also allowed Scott leave to respond to Sharon's October 26 motion to modify.

¶ 12     As Scott would fully explain at trial, the move to Michigan was temporary. But while he was there, he was involved in a domestic incident with his father-in-law. The record is fuzzy on details, but it ended with Scott spending a night in jail and Jade obtaining a protective order against Scott. The protective order did not list any of his children or restrict his parental rights in any way.

¶ 13     Shortly after the incident, in March 2022, Scott moved back to the Chicagoland area and filed for divorce from Jade. Despite moving back, the November 2021 emergency order limiting his parenting time remained in place. Finally in March 2024, Scott filed a motion to reinstate the original parenting schedule from the AAJ. Scott explained at trial that he waited so long to file his petition because he first tried to settle the issue with Sharon without litigation, but she refused. And after the case had dragged on for 11 years, he didn't have the money or emotional

energy to constantly fight Sharon in court. Sharon would later admit that she would have never agreed to give Scott his time back and that "it would have been litigated."

¶ 14    In addition to the parenting-time issue, Sharon's October 26 petition also sought to modify the parties' decision-making rights. Recall that, in the AAJ, the parties shared decision-making, except for education decisions, which was Scott's exclusive domain. Sharon's petition sought to invest *her* with sole decision-making authority over *all* major decisions.

¶ 15    In April 2024, the court began the hearing on Sharon's petition to modify and Scott's petition to reinstate his parenting time. The hearing consisted of several days of testimony drawn out from April to December. Scott was represented by counsel, while Sharon appeared *pro se* throughout.

¶ 16    The majority of the hearing was consumed with Sharon's questioning of witnesses and her narrative testimony. While we commend her effort, most of the evidence she elicited can be summarized as a list of grievances against Scott, which admittedly are numerous. What's more, almost all these grievances concerned Scott's treatment of Sharon, not the kids (though we acknowledge that Scott's treatment of Sharon was, at times, deplorable).

¶ 17    The children's GAL, Michael Bender, was adamant about one thing: stability in the choice of the kids' schooling was paramount. He explained that, during Scott's exclusive control over educational decisions, there had been a lot of inconsistency with the kids staying at the same school. The details are unclear, but it appears the kids had enrolled in approximately three schools in four or five years. Nevertheless, the children were doing well and thriving at their current school, St. Jerome Catholic School (St. Jerome), and the GAL recommended that the boys stay at the school until at least the older of the two graduated. As to their younger child, the GAL explained that since he was much further away from completing the program, it was a

"different" consideration. Regardless of his opinion on whether the younger child should stay at St. Jerome, the GAL believed that consistency was key, and that the boys had not achieved that with Scott at the helm.

¶ 18    The GAL also had a few grievances with Sharon. During her questioning, Sharon attempted to show that the GAL's opinion was made without having spoken to the boys. He admitted he hadn't spoken to them before the hearing. But he had "been trying to set that up for about two months now," and Sharon "ha[d] been difficult about it." For example, Sharon insisted that he speak to her first and demanded to know what he would ask the kids, which the GAL deemed "completely inappropriate."

¶ 19    The GAL's conclusion that Sharon was "difficult" was not solely based on this one instance. At this point, said the GAL in response to Sharon's questioning, he was

> "just used to it because it is always a process with you. If I get to speak to the kids, you are always extremely resistant. At least since mid-March I have been trying to set it up. Then there is always a hurdle.
>
> Then I was—actually I heard you talking on the phone yesterday to my associate and heard what you described as running her in a circle while she was trying to set up a time for me to talk to the boys where you started with their schedule doesn't work. Then came down to, well, I want to talk to him first. Then after I told her to tell you that we talked at the deposition, you then said, well, it wasn't sufficient.
>
> At that point you were way out of line as far as what it is you have the ability to do when the Court appointed GAL or child rep needs to speak to the children before a hearing. So at that point it wasn't—I made a determination that it wasn't worth going in a circle with you anymore."

¶ 20    As it relates to education, there were two other major points of contention. First, Sharon claimed that Scott was not involved and did not volunteer for the kids' activities or fully participate in their extracurriculars. Scott, himself, admitted that he did not volunteer as often as Sharon did. He believed he had reached out to volunteer a couple of times but could not remember if any of those offers bore fruit.

¶ 21    As to the extracurriculars, Scott admitted that he sometimes chose to keep the boys out of their activities. He explained that he did so because, due to the November 2021 order limiting his parenting time, he wanted to maximize the amount of time that he got to spend with his kids. He felt it was important for *him* to spend time with the boys instead of simply driving them from one event to another. He also wanted the boys to spend time with their half-brother, the child Scott shares with Jade. Scott expressed frustration that many of the events that Sharon signed them up for fell on his limited parenting time. (Sharon said they fell on *hers* as well.)

¶ 22    The court heard a good deal of testimony about Scott's alleged abuse of his sole education authority. Sharon agreed with the GAL that swapping schools was bad for the children. But she also thought Scott chose schools that solely benefited him. For example, one of the schools he chose was a few minutes from where Scott lived but a 45-minute commute from the neighborhood where Sharon lived. Throughout the hearing, Sharon expressed concern that Scott was using his sole educational authority to her detriment. Scott testified that he chose St. Josaphat, one of the prior schools, because it was a small, affordable school with a STEM focus, not as some vindictive ploy against Sharon.

¶ 23    Sharon also described an instance where she believed Scott was too controlling over their younger son's education. After schools began going back to the classroom during the COVID pandemic, Scott delayed the younger child's return for about a month, which Sharon believed

was harmful to the child's overall education. Scott, on the other hand, explained it very simply: since their younger son had a history of severe medical issues with his lungs, he felt it was best to hold him out of school until he thought it was safe.

¶ 24    The court heard testimony about a particular "incident" involving the older child while he was in the sixth grade. According to a teacher, Karen Mizera, around the second month of the school year she noticed that "on certain days, his behavior, he would become upset." Upon investigation, the teacher learned that the child "was very concerned about going home with his father." Some days, she claimed he would become so upset that he would start crying.

¶ 25    On one such day, the child became so upset at the prospect of going home that he got "sick." Based on what the child reported (his actual outcry was stricken as hearsay), the teacher brought the situation to the assistant principal's attention, who then contacted DCFS. The police were called, but the teacher was not aware of any further action.

¶ 26    Apparently, this incident stemmed from the child's concern that Scott was going to severely punish him because of a missing laptop. As best we can tell, the older child took the younger's laptop while the kids were staying with Scott. Scott reached out to Sharon about whether she knew where the laptop was. What is unclear is how the *child* learned that Scott was angry about the laptop. Sharon denied saying anything, but Scott and the GAL did not believe there was any other way the child could have known absent Sharon telling him (leading Scott to claim that in reality it was Sharon who was committing emotional abuse).

¶ 27    Either way, DCFS did not pursue the report further. After being questioned by the court, the GAL confirmed that he did not believe Scott "is a danger to his children."

¶ 28    On the question of parenting time, as we briefly explained above, Scott testified that his move to Michigan was temporary. Scott described it as a "temporary" reset that was necessary

due to financial hardship, the strain that this case was putting on his marriage to Jade, and a fire at his Chicago home.

¶ 29   During trial, even Sharon admitted that "the only reason why his regular parenting time was changed was because he was living in Michigan at the time." The court likewise acknowledged that it considered the November 2021 modification to be a temporary order.

¶ 30   As to whether the court should return to the 50/50 schedule, the parents sharply disagreed. Scott believed the court should revert his parenting time to the original schedule now that he was back in Chicago. Sharon was quick to note that Scott actually lived in Oak Park and had listed his Chicago condominium for sale. In her view, that was proof that Scott was not serious about staying in the area, and she feared he would move to the suburbs and once again use his power to abuse his parenting rights. Sharon believed she should be the custodial parent because, in her opinion, Scott was simply a bad parent.

¶ 31   The GAL had a different view. He testified that "[t]hey are both good parents. They just don't get along." He believed that "[Scott] needs 50 percent of the time just like [Sharon did] because [they] will both cut each other out of the children's lives otherwise." He felt the current situation, with the time being skewed in Sharon's favor, was "concerning" because Sharon does not facilitate the children's relationship with Scott. In fact, he did not believe that either parent necessarily had the ability to facilitate a relationship with the other.

¶ 32   As the testimony was coming to a close, Sharon kept repeating her concerns that neither the GAL nor the court had spoken with the children. Eventually, the court ordered the kids to speak with the GAL. During the October 4 hearing, the GAL explained that he'd spoken with the kids. He reported that they had slightly different concerns about the case. The older child

explained that "for the most part, all is good in both homes," and he just wanted "the Court and the conflict between my parents" to end because it weighed on him.

¶ 33     According to the GAL, the older child's primary concern was staying in the same school until he graduates. The older child also wasn't keen on going back to having visitation with his dad during the week, but only because "he remembers that mom would have to drive a long distance from Bridgeport to Bucktown to take him to school, and he didn't want his mom to have to do that again." Other than the travel issue, there was nothing that bothered him about equal parenting time. The GAL's primary concern was getting the older child "out of the middle of this" because it was taking a toll on him.

¶ 34     The younger child, on the other hand, was "ambivalent about school. He doesn't like it. He doesn't dislike it." His only real desire was that he "[h]opes to see his dad more now that there isn't traveling to Michigan for his parenting time. So he is fine with more time."

¶ 35     After closing arguments on Sharon's petition, on October 4, the court made an oral ruling. It found that there had been no change in circumstances that warranted granting Sharon's motion to modify, and that the AAJ would remain in place. That said, the court emphasized to Scott that he should keep the kids at their current school because it was apparent from the hearing that it was beneficial for them. Still, the court recognized, "since the Court found no substantial change in circumstance, the Court cannot force Mr. Clark to do that." As to Scott's motion to reinstate parenting time, the matter was continued to October 25 to wrap up that issue.

¶ 36     Unexpectedly at the start of the October 25 hearing, the court let the parties know that "I am *sua sponte* reversing my decision right now because I want to do an *in camera* interview of the minor children on Wednesday. And then I will issue a ruling—a written ruling after that." After further discussion, the court indicated that it would issue written rulings on both Sharon's

motion to modify and the issue of Scott's parenting time.

¶ 37    On October 30, the court held an *in camera* interview of the minor children with the GAL present. After some motion practice in this court, we have the transcript of this interview in the record. As we explained to the parties, out of respect for the privacy of the children, we will not go into detail about the interviews. We say only this: the children did not say anything inconsistent with the other evidence given in this case, and the GAL's recommendation of a return to 50/50 parenting time did not change after the *in camera* interviews with the children.

¶ 38    The final hearing on the issue of Scott's parenting time was held in December. At this hearing, Scott confirmed that he was living in his condominium in Chicago and that it was no longer for sale. When Sharon pressed Scott about how long he was planning on staying at that location, he said he "can't answer that right now. I don't know."

¶ 39    Finally, Sharon reiterated that the three years of stability the boys had experienced while she had primary parenting time had been great for them. They were doing better in school, had friends, and were overall happy. She was particularly concerned that returning to constant driving and inconsistency would be detrimental to the children.

¶ 40    On January 22, 2025, the court issued its written findings of fact and memorandum opinion. In a slight reversal from its oral ruling, the court found that there was a substantial change in circumstance that warranted altering the parties' decision-making rights. Due to the extensive evidence about the children's education, the court concluded that Scott having sole decision-making authority had resulted in "instability." As a result, the court modified the AAJ so that Sharon "share[s] equal (50/50) educational decision-making responsibilities." The court also ordered that "[t]he minor children shall remain at their current school, St. Jerome School for the 2024-2025 school year."

¶ 41 The court also granted Scott's motion "as it relates to parenting time and reinstating the April 12, 2019 Agreed Allocation Judgment." In doing so, it concluded that Scott returning to Chicago constituted a substantial change in circumstances that, after considering the statutory factors, warranted reinstating the parties' original agreed schedule.

¶ 42 Within 30 days of the court's written order, Sharon filed her notice of appeal. But Scott filed a timely motion to reconsider the court's judgment. On Sharon's motion, we stayed her notice of appeal until resolution of Scott's motion below. See Ill. S. Ct. R. 303(a)(2) (eff. July 1, 2017). The circuit court denied Scott's motion to reconsider, and he chose *not* to appeal that decision. We then lifted the stay.

¶ 43 The original disposition due date in this expedited appeal was July 21, 2025. But due to the stay, motion practice over the court's *in camera* interview, and Sharon's requests for extensions of time in the briefing schedule, briefing was not completed until December 23, 2025.

¶ 44                                              ANALYSIS

¶ 45 Sharon appeals the court's judgment. Broadly speaking, she seeks to reverse the court's orders denying her sole decision-making authority and reinstating Scott's equal parenting time.

¶ 46 Illinois law "reflects an underlying policy favoring the finality of child custody judgments" to promote stability in the child's life. *In re Marriage of Fuesting*, 228 Ill. App. 3d 339, 344 (1992). The law recognizes that things change, but a mere change in circumstances is not enough to modify a judgment. Instead, the relevant statute, the Illinois Marriage and Dissolution of Marriage Act, 750 ILCS 5/101, *et seq.* (West 2024) (the Act), provides that:

> "the court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation

judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." *Id*. § 610.5(c).

¶ 47 Thus, to modify an allocation of parental rights, the court needs to find both that there has been a substantial change in circumstances and that modification is in the best interests of the children. *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 43. As Sharon notes, at least one decision suggests that the change in circumstances need not be *substantial* to change parenting time, see *Reynolds v. Reynolds*, 2025 IL App (2d) 240028, ¶ 34, but we need not explore that further, as Sharon herself concedes that "a substantial change in circumstances occurred." So our only question is whether the court's modifications were in the best interest of the children.

¶ 48 We review a court's modification of an allocation judgment for manifest error. *In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004). We will reverse only if the opposite conclusion is clearly evident. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. We view the evidence in the light most favorable to the appellee. *Bates*, 212 Ill. 2d at 516.

¶ 49 In determining the best interests of the child, the Act sets out over a dozen factors for the court to consider. See 705 ILCS 5/602.5(c) (West 2024) (15 factors for determining best interests when allocating decision-making); *id*. § 602.7(b) (17 factors when determining best interests for parenting time). The factors contained in sections 602.5 and 602.7 substantially overlap. We need not list each of them, as Sharon focuses only on a few.

¶ 50                                I. Decision-making

¶ 51 We begin with Sharon's argument that the court erred by not giving her sole decision-making power over *all* major decisions. In her view, because she and Scott cannot get along, joint decision-making, of any kind, is unsustainable.

¶ 52    The Act requires the court to consider "the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making" (*id*. § 602.5(c)(4)) and "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." (*id*. § 602.5(c)(11)). Sharon claims that any joint decision-making requires an "unusual level of cooperation." *In re Marriage of Swanson*, 275 Ill. App. 3d 519, 524 (1995).

¶ 53    The court acknowledged that the two have had a contentious relationship in the past, particularly noting that they each threatened to "enroll and disenroll the children in schools and extracurricular activities without consulting the other parties [*sic*]." But the court noted that "as the ongoing proceedings have been conducted, the parties have shown their interest to work in the best interest of their children" and have "similar desires to place their children in the best situations and environments possible to allow the children to flourish." The court found that "both parties credibly testified that they want to co-parent for the best interest of their minor children. Both parties testified that each parent is a good parent."

¶ 54    Sharon takes particular umbrage with that last finding—that each testified the other is a good parent. As she correctly points out, she *never* testified that Scott was a good parent. The closest she ever got was: "I think he has his moments to be good." In fact, her entire case was premised on the exact opposite conclusion. She consistently and repeatedly testified that, in her eyes, Scott is a bad parent. Nor, for that matter, do we see any testimony where Scott makes any express judgment that Sharon was a good parent. On this point we believe the circuit court simply erred in its attribution of the testimony—it was the GAL who testified that each was a good parent. The error in attribution aside, the court had a sufficient basis to conclude that both Sharon and Scott were good parents.

¶ 55    The record supports the conclusion that the parties, though contentious with one another, each care about their children and want what they believe is best for them. But that is Sharon's point: there is no evidence supporting the conclusion that they were willing and able to work *together*. She argues that, even with joint decision-making, Scott has engaged "in a pattern of unilateral decision-making" with the goal of excluding her from important decisions.

¶ 56    Our fundamental problem with Sharon's argument is that, while she sufficiently proved to the court's satisfaction that Scott should not have unilateral decision-making authority, we see nothing particularly compelling in the record to suggest that she should have that sole authority, either. Most of the evidence she put forth established that Scott is often inappropriately disrespectful, even vile at times, in his communications with Sharon. The only other area in which Sharon had any significant evidence of consistent unilateral decision-making was in the area of education—which Scott previously had but which the trial court took away in its order.

¶ 57    The thrust of Sharon's argument is that joint decision-making cannot work because of the acrimony between the parents. But the GAL gave a good reason why sole decision-making should not vest in either parent—his concern that each parent would inevitably try to cut the other out of the children's lives. As Scott notes in his brief, this court recently affirmed joint decision-making where the parties were unquestionably hostile to one another. In that case, the circuit court was greatly concerned about the parents' ability to cooperate. *In re Marriage of McLean*, 2025 IL App (5th) 250094, ¶ 79. The evidence showed the "parties had a toxic relationship" and neither wanted to cooperate. *Id*. ¶ 81. The circuit court placed particular emphasis on the concern that " 'if one of the parties were awarded sole decision-making regarding any of the major decision-making areas then the other party would likely be excluded from that decision-making.' " *Id*.

¶ 58    Overall, it is clear from the record that the court fully considered the evidence and the appropriate factors. While Sharon may not be happy with joint decision-making, the evidence and testimony in this case make it clear that the consequences of sole decision-making—by either parent—may well be worse. We find no basis to find that the opposite conclusion is clearly apparent; the court's decision was well supported by the evidence. We thus uphold the court's judgment on decision-making.

¶ 59                    II. Restoration of Scott's Parenting Time

¶ 60    Sharon next argues that the court erred in restoring Scott's parenting time. We begin with her most serious contention: that the circuit court ignored "the domestic violence issue in this case." See 750 ILCS 602.7(b)(11) (West 2024) (court must consider physical violence or threat of violence directed towards children). We do not agree.

¶ 61    Sharon went to great lengths to introduce evidence about the incident in Michigan involving Scott, his father-in-law, and Jade. Throughout the trial, she cast him as a domestic abuser. While he spent one night in jail and had an order of protection entered against him, the testimony established that Scott's parental rights were not impacted by the order of protection, and that Scott was not a threat to the children. There is no question that the court took this issue seriously. In fact, whether Scott was a danger was one of the only questions that the court, itself, posed to any witness. We know very little about the incident involving Scott and his family in Michigan. But we cannot agree that the circuit court failed to consider it.

¶ 62    For the rest of her argument on parenting time, Sharon reiterates the deficiencies in her relationship with Scott and claims that the evidence established that, under Scott's truncated parenting time, the children were thriving. See *id.* § 602.7(b)(6) (court considers "the child's adjustment to his or her home, school, and community" when determining parenting time). She

argues that the children have had much more time to develop friendships and engage in extracurricular activities. Now, she claims, with a divided parenting schedule, the kids will have to spend more time in a car, which threatens the newfound stability they enjoyed.

¶ 63    There is no doubt that the older child much prefers staying in or near the south side of Chicago. The evidence in this case is clear that he, particularly, has found much needed stability by primarily residing with Sharon (and having predictability in his school). But it is also true that the younger child "[h]opes to see his dad more now that there isn't traveling to Michigan." See *id.* § 620.7(b)(2) (court shall consider wishes of children in determining parenting time).

¶ 64    While the evidence showed that the children are doing well, the extra time with Sharon comes at a cost. As the GAL testified in response to Sharon's questioning:

> "the time being skewed your way is concerning because you, in my opinion, will not facilitate a relationship between the children and Scott. And if it were the other way, I would want you to be reinstated because I don't believe Scott will at this point facilitate a relationship between the children and you."

¶ 65    Sharon also ignores the fact that the only reason she ever obtained a lopsided share of parenting time is that Scott moved to Michigan. While she argues that his move and the November 2021 order were not actually temporary, even she admitted at trial that the only reason the schedule was changed in the first place was because of Scott's move. It is clear from the court's ruling and statements at trial that the court also placed significance on this crucial fact.

¶ 66    Viewed in that manner, the court was essentially returning the parties to the status quo before Scott's temporary move to Michigan. Now that he returned to Chicago, the court saw no good reason not to restore his equal share of parenting rights.

¶ 67    Obviously, the strain in the parents' relationship is deep. But as things stand, the court and GAL believed that equal time is necessary to protect the children from the vindictive tendencies of each parent towards the other. The court's decision to revert Scott's parenting time was fully supported by the record and is not against the manifest weight of the evidence.

¶ 68                                    CONCLUSION

¶ 69    The judgment of the circuit court is affirmed.

¶ 70    Affirmed.