2026 IL App (2d) 240719-U
No. 2-24-0719
Order filed June 2, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

*In re* MARRIAGE OF JUSTIN SEYL, Petitioner-Appellant/Cross-Appellee,

and

SANDRA SEYL, Respondent-Appellee/Cross-Appellant.

Appeal from the Circuit Court of Lake County.
Honorable Michael Nerheim, Judge, Presiding.
No. 22-DN-156

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Kennedy and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court did not abuse its discretion in dividing the marital estate or in its maintenance, contribution, dissipation, and sanction findings.  Affirmed.

¶ 2   Petitioner, Justin Seyl, appeals from the trial court's judgment dissolving his marriage to respondent, Sandra Seyl.  Justin challenges the court's (1) allocation of the marital estate, (2) award of maintenance to Sandra, (3) dissipation findings, (4) award of contribution from Justin towards Sandra's attorney fees, and (5) sanctions.   Sandra cross-appeals, challenging two aspects of the court's property allocation.  We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Judgment

¶ 5      The parties married on September 27, 1999, in Gatlinburg, Tennessee. In 2007, they relocated to Libertyville, Illinois. On March 25, 2022, Justin petitioned to dissolve the marriage, and, on March 29, 2022, Sandra filed a counterpetition for dissolution.

¶ 6      On August 12, 2024, the trial court entered its 69-page judgment dissolving the parties' marriage. At that time, the parties were both 48 years old, had been married about 25 years, and had three emancipated children (two children born from the marriage (ages 23 and 22) and Sandra's son from a previous marriage (age 30)).

¶ 7      Due to the length and detailed nature of the judgment, we will address the court's findings relevant to each appellate argument in our analysis of those arguments. In sum, however, we note that the court: (1) after considering the factors in section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(d) (West 2022)), awarded a 50/50 division of the marital assets; (2) found that Justin dissipated $838,256 in marital assets; (3) after considering the factors in section 504 of the Act (*id.* § 504), awarded Sandra indefinite maintenance in the amount of $32,500 monthly, as well as retroactive maintenance in the amount of $465,494 (paid over 96 months); and (4) after considering sections 503(j) and 508(b) of the Act (*id.* §§ 503(j), 508(b)), ordered Justin to pay Sandra, within 30 days of the judgment, $395,138.51 as contribution towards attorney fees and costs (making him responsible for 75% of the total attorney fees and costs paid from marital assets (excluding the fees paid from the marital businesses), except for the fees from the court appointed expert, Jeffrey Brend, which the court ordered evenly split). In addition, pursuant to section 501(a)(1) of the Act (*id.* § 501(a)(1)), the court also awarded Sandra an additional 35% of the existing cryptocurrency accounts (on top of her 50% share awarded from

the property division, and, thus, 85% total) as a sanction against Justin for failing to disclose that asset in discovery. Further, in response to Sandra's motion for discovery sanctions and other relief, the court ordered Justin to pay $20,000 to charity as a sanction for perjury and discovery violations.

¶ 8 With respect to the court's findings concerning dissipation, contribution, and sanctions, we note that it dedicated nearly 26 pages of its decision (some single spaced) to recounting Justin's acts of dissipation, lack of credibility, perjury, bad conduct, and refusal to follow court orders. Indeed, the court found,

> "[T]he evidence has established a complete lack of credibility on Justin's part. His testimony at trial was at times evasive at best, and other times flat out perjury. In an area of law that is unfortunately known for bad conduct on the part of litigants, this case stands out."

In sum, the court noted that Justin and his fiancé went to great lengths to conceal a secret August 2023 "wedding" ceremony in Hawaii, lied "countless times under oath," attempted to fraudulently and "potentially illegally" intercept Sandra's subpoena to the hotel, and repeatedly asserted their Fifth Amendment privileges at trial. The court stated that, because Justin completely lacked credibility, it could not rely solely on his word without documentary proof. Further, Justin had directly violated court orders, including those pertaining to the mortgage on the parties' South Carolina home, which had a negative financial impact on the property.

¶ 9 Additionally, the court recounted that, in March 2022, one week *after* Justin petitioned for divorce, he transferred approximately $840,000 in cryptocurrency to storage sites. When he filed two financial affidavits in July 2022, neither mentioned any cryptocurrency, nor did his answers to interrogatories. When confronted by Brend and his team with their discovery of the

- 3 -

cryptocurrency accounts, Justin then listed on his March 2023 financial affidavit over $900,000 in cryptocurrency. The court stated,

> "Justin testified that failing to disclose the cryptocurrency on his financial affidavits or answer to interrogatories was an 'inadvertent mistake.' Absent Justin's repeated attempts to mislead this Court, his explanation would still be difficult to accept. Based on his established lack of credibility, the Court finds that Justin's actions with respect to cryptocurrency amount to an intentional act designed to mislead Sandra, her counsel, and ultimately the Court."

¶ 10 Finally, in addition to considering Justin's conduct, which needlessly increased fees, in awarding contribution, the court further noted that the willful nature of his behavior warranted a monetary penalty of $20,000 for charity. It found,

> "this penalty [is] appropriate as the conduct in this case was beyond egregious. Justin's actions in attempting to circumvent Sandra's subpoena, withhold[ing] evidence, and his repeated incidents of perjury cannot be ignored. The Court hopes this penalty, as well as its findings above, will serve to discourage this behavior in future proceedings."

¶ 11                                    B. Motions to Clarify and Reconsider

¶ 12 On November 13, 2024, the court ruled on the parties' postjudgment motions. Justin argued the court misapplied the law in (1) allocating the marital estate to effectuate a 50/50 division, (2) the reasonableness of the sanctions award, and (3) the determination of maintenance awarded to Sandra. The court denied all but one of Justin's requests to modify the judgment (the exception concerned a claim regarding a tax liability of $19,670). The court also denied Sandra's request for clarification and modification.

¶ 13    On November 25, 2024, Justin filed his notice of appeal.  On December 9, 2024, Sandra filed her notice of cross-appeal.

¶ 14                                    II. ANALYSIS

¶ 15    On appeal, Justin challenges the court's (1) equal allocation of the marital estate, (2) maintenance award, (3) dissipation findings, (4) contribution award, and (5) sanctions.  Sandra cross-appeals, challenging two aspects of the court's property allocations.

¶ 16    All issues before us require application of either the abuse-of-discretion or manifest-weight-of-the-evidence standards: (1) distribution of marital property (*In re Marriage of McLean*, 2025 IL App (5th) 250094, ¶ 49 (distribution of marital property lies within the sound discretion of the circuit court); *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 205 (2005) (we apply the manifest-weight standard to the factual findings for each factor upon which the court based its property disposition, but we apply the abuse-of-discretion standard when reviewing the court's "final property disposition (and how the trial court considers those factors")); (2) maintenance (*In re Marriage of Micheli*, 2014 IL App (2d) 121245, ¶¶ 20-21 (we apply manifest-weight standard to the factual findings regarding a maintenance determination, but we apply abuse-of-discretion standard to a maintenance award, as the "court has wide latitude in considering what factors to use in determining reasonable needs, and the trial court is not limited to the factors listed [in the Act]")); (3) dissipation (*Vancura*, 356 Ill. App. 3d at 204 (whether dissipation occurred in a given case is a factual one, thus manifest-weight review applies)); (4) contribution to attorney fees (*In re Marriage of Buonincontro*, 2022 IL App (2d) 210380, ¶ 41 (ruling on a petition for contribution to attorney fees reviewed for an abuse of discretion)); and (5) sanctions (*Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 120 (1997) ("only a clear abuse of discretion justifies reversal" of sanctions imposed under Illinois Supreme Court Rule 219(c) (eff. July 1, 2002)); *Dowd & Dowd,*

*Ltd. v. Gleason*, 181 Ill. 2d 460, 487 (1998) (decision to impose sanctions under Illinois Supreme Court Rule 137(a) (eff. Jan. 1, 2018) will not be overturned unless it represents an abuse of discretion)).

¶ 17　　An abuse of discretion occurs where the decision is arbitrary or unreasonable. *Buonincontro*, 2022 IL App (2d) at ¶ 41. Similarly, a finding is against the manifest weight of the evidence where it is unreasonable and not based on the evidence. *Micheli*, 2014 IL App (2d) 121245, ¶ 21.

¶ 18　　　　　　　　A. Justin's Appeal: Equal Division of the Marital Estate

¶ 19　　Justin argues first that the court's division of the marital estate was not equitable and constitutes an abuse of discretion. He argues that consideration of the factors in section 503(d) of the Act reflect that he should have received a disproportionate (*i.e.*, greater share than Sandra) of the marital estate. Further, Justin argues, the court's division of the estate did not, in fact, constitute a 50/50 division. For the following reasons, we reject Justin's arguments.

¶ 20　　　　　　　　1. Contributions to the Marriage: Section 503(d)(1)

¶ 21　　Section 503 of the Act governs the distribution of marital property and directs courts to consider various factors and distribute marital property to the spouses "without regard to marital misconduct in just proportions considering all relevant factors." 750 ILCS 5/503(d) (West 2022). To divide the marital estate "in just proportions," section 503(d)(1) of the Act allows the court to consider each party's contribution to the acquisition, preservation, or increase or decrease of the marital or non-marital property, including a spouse's contribution as a homemaker or to the family unit. *Id.* § 503(d)(1). Justin argues that this factor "significantly" favors him receiving a disproportionate share of the estate, because the estate's considerable value (over $13 million) was built "almost entirely" through his hard work and extraordinary efforts, including starting five

- 6 -

businesses. He notes that he dropped out of college, even performing "backbreaking labor in a steel mill," to care for Sandra's son, supported her niece over whom they obtained guardianship, and cared for Sandra and their children. Justin asserts that his extraordinary efforts to participate and contribute to the family, even to care for children who were not his, justifies awarding him a disproportionate share of the estate. Although he acknowledges that Sandra contributed as a homemaker and to the family unit, she "did not contribute as a homemaker at nearly the same level that Justin did as a provider," given that the family lifestyle included a personal chef, personal assistant, housekeepers, and nannies. He contends that Sandra admitted to a lavish lifestyle, and he argues that she cannot have it both ways, enjoying a lavish lifestyle while also claiming she made significant personal efforts as a homemaker.

¶ 22    When assessing this factor, the trial court noted that the parties owned five successful business interests that currently generate substantial income and provide the parties with a significant lifestyle. However, the court noted that this was not always the case, with the parties once experiencing a financial setback, home foreclosure, and bankruptcy. Yet, the "parties built these businesses from the ground up and [with] an impressive entrepreneurial spirit." As to Sandra, the court found that she graduated from the University of Tennessee in 1998, worked for the parties' businesses from 2016 to 2022, and, although she obtained her Master of Business Administration (MBA) degree in 2018, her last employment outside of the marital businesses was for the Lake County Health Department (from 2007 to 2016), where she earned $35,000 to $40,000 per year. Further,

> "[W]hile Sandra worked for the business from 2016 to 2022, [she] primarily served as a homemaker and caretaker for the parties' children while Justin grew the business. Both parties testified that, at various times, they served as the primary caretaker for the parties'

children.   However, the evidence established that Sandra was the primary caretaker, although she was not without help as the lavish lifestyle of the marriage provided for a private chef, a personal assistant, housekeepers, and nannies."

¶ 23    Accordingly, Justin's arguments fail to establish that the court's findings lack evidentiary support or constitute an abuse of discretion; he simply disagrees with the court's failure to expressly weigh this factor in his favor.  The court plainly considered and recognized Justin's significant contributions to the marriage, as well as the marital lifestyle which afforded Sandra assistance within the home.  It also found though that Sandra's employment experience was limited and, overall, her efforts during the marriage focused on the household.  Overall, the court's section 503(d)(1) findings were not unreasonable.  Justin's argument essentially asks us to reweigh the evidence, but that is not our role.  See, *e.g.*, *In re Marriage of Werries*, 247 Ill. App. 3d 639, 642 (1993).  His cited cases are inapposite, as they concern appellate courts simply *upholding* disproportionate estate divisions, whereas, here, he seeks reversal of the court's equal division.  See, *e.g.*, *In re Marriage of Abma*, 308 Ill. App. 3d 605 (1999); *In re Marriage of Petrovich*, 154 Ill. App. 3d 881 (1987); *In re Marriage of Guntren*, 141 Ill. App. 3d 1 (1986); *In re Marriage of Wright*, 180 Ill. App. 3d 911 (1986); *In re Marriage of Jones*, 187 Ill. App. 3d 296 (1989).

¶ 24                            2. Dissipation of Marital Property: Section 503(d)(2)

¶ 25    Justin argues that, while the court found that he significantly dissipated marital property, this factor nevertheless favors neither party because the court compensated Sandra "dollar-for-dollar" for the dissipation, as if it had never occurred.  He contends that Sandra does not require further compensation in the form of marital property allocation for Justin's dissipation, noting caselaw provides that, "[w]here a party has dissipated marital assets[,] the court may charge the amount dissipated against his or her share of the marital property so as to compensate the other

party." *In re Marriage of Partyka*, 158 Ill. App. 3d 545, 550 (1987). Justin asserts that, while his dissipation may not entitle him to a disproportionate share of the estate, the fact that Sandra was compensated for the dissipation fully offsets any argument she may have to the contrary.

¶ 26 Preliminarily, it appears that Justin's reliance on *Partyka* supports the court's approach here, where, in its discretion, it incorporated its dissipation findings by considering Justin's $838,256 in dissipation expenditures as an advance on his ultimate share of the marital assets. In any event, Justin does not explain how the court allegedly abused its discretion when assessing this factor. Certainly, the court rendered *lengthy* findings regarding Justin's significant dissipation of marital assets that decreased the value of the marital estate, as alluded to earlier and as further discussed later in this analysis, but Justin's argument here does not explain how those findings were against the manifest weight of the evidence or rendered unreasonable the court's distribution of the marital property. Indeed, Justin's view that this factor favors neither party is illogical; the Act provides these factors for the court to assess what division would be "just" and, so, the party who dissipated and reduced the value of the estate would presumably find those actions reduced his or her claim to a greater share of the estate. In any event, as Justin acknowledges, it would certainly not support his claim on appeal that he deserved a *greater* share of the marital estate.

¶ 27 3. Value of the Property Assigned to Each Spouse: Section 503(d)(3)

¶ 28 Justin acknowledges that the court awarded him 100% of the parties' business interests, valued at $5,463,330. In turn, the court awarded Sandra 100% of the investment and retirement accounts and 85% of the cryptocurrency accounts. Each party received his or her own vehicles. Justin received a home in Libertyville, as well as a property in Mundelein, while Sandra received their South Carolina home. Justin does not dispute that he *should* receive the marital businesses; rather, he complains that he received virtually no liquid assets, and he claims that his net cash (after

offsets from tax liabilities) totaled only $236,587, whereas Sandra's liquid assets include $2,045,453, plus retirement assets of $3,872,827, which "Sandra can access whether by loans or early withdrawals." And, as Sandra's maintenance supports her needs for liquid cash, Justin argues, Sandra does not share his lack-of-liquidity concerns. Finally, Justin claims that he has no non-marital property, whereas Sandra retained her non-marital assets. In sum, Justin contends that this factor favors his receipt of a disproportionate share of the marital estate. We disagree.

¶ 29    When assessing this factor, the court noted the significant size of the marital estate. It considered the analyses performed by Brend, the court-appointed expert who prepared a lifestyle report for the parties, and Brian Potter, Sandra's expert who testified and prepared a report related to Sandra's needs. Brend, in sum, concluded that the parties' historical lifestyle from 2019 to 2022 was $36,275 per month (which was within approximately $2,000 of Sandra's financial affidavit that Justin had challenged). Potter, in sum, relied on the information in Brend's report, accounted for passive income Sandra could receive on her assets with varying rates of return, and concluded that, assuming an equal division of the marital estate, Sandra would exhaust her assets by age 79, if she: (1) received $35,000 per month in maintenance, and (2) $25,000 per month of income through employment. The court determined that the value of the marital estate, excluding the cryptocurrency, was $11,263,806 and, thus, with an equal distribution, each party would have sufficient assets to continue in the lifestyle the marriage provided.

¶ 30    None of Justin's complaints about liquidity or the nature of the 50/50 division serve to support his assertion that the court should have awarded a disproportionate allocation in his favor. Justin's arguments do not reflect the court's finding were unsupported by evidence or unreasonable. Indeed, he does not suggest that he should be given *less* than 100% of the business interests *in exchange* for liquid assets. Rather, Justin's arguments simply reflect a disagreement

with not receiving 100% of the businesses *and* additional liquid assets. As Sandra notes, Justin ignores that his dissipation reduced liquidity within the estate and, moreover, that the court granted his request to be awarded 100% of the businesses, which apparently generate for him more than $100,000 per month in net income. Again, it is not our role to reweigh the evidence. See, *e.g.*, *Werries*, 247 Ill. App. 3d at 642. In short, this factor does not favor Justin's argument that he deserves a disproportionate share of the estate, where the court carefully and thoroughly reviewed the record and expert reports before reasonably dividing the assets.

¶ 31                          4. Duration of Marriage: Section 503(d)(4)

¶ 32    Justin argues that this factor favors him. He defines the length of the marriage as 22 years, (as of the time he filed his dissolution petition). Justin concedes that, over a long-term marriage, a party's contribution as a homemaker may carry great weight, but he again notes that, here, many homemaking duties were performed by third parties, whom he paid from his income and employment efforts.

¶ 33    We disagree. This factor does not favor a disproportionate division in Justin's favor, nor render unreasonable the court's findings that the 25-year marriage included significant contributions from both parties in different roles.

¶ 34    5. Age, Sources of Income, Occupation, Employability, and Needs: Section 503(d)(8)

¶ 35    Next, Justin notes that both parties are age 48 and in good health, but he is a college dropout, while Sandra has a bachelor's degree and an MBA, paid for by the marital estate, "funded nearly entirely by Justin." He alleges that the trial court failed to consider his contributions toward Sandra obtaining her MBA, her increased earning capacity resulting from the MBA, and imputed income to her of only $35,000 to $45,000, consistent with her pre-MBA income. Accordingly, Justin surmises, the marital assets should be divided to support his past contributions to Sandra's

education and her increased earning capacity. He also alleges that Sandra received considerable investment income. Justin therefore concludes that this factor favors neither party, as his significant employment income is offset by her substantial passive income, his contributions to her education, and her enhanced earning capacity from the MBA.

¶ 36    Justin's arguments presume that Sandra's MBA increased her earning capacity when, in fact, the court found otherwise. Namely, the court found that, as a direct result of her substantial contributions to "the family and the businesses," Sandra's earning capacity is limited and "there is no question that Sandra is unable to support herself consistent with the marital standard of living." The court recognized that Sandra had obtained an MBA, but found that she had been unable to use it while working in the family businesses, where she devoted significant time to performing more day-to-day tasks and, therefore, had no applied practical experience that would allow her to market herself as qualified for MBA-level jobs. The court also found that, after Justin fired Sandra from the business in late March 2022, Justin refused to provide her with a reference, on the basis that her degree was "worthless." The court found that Sandra made significant efforts to obtain gainful employment but was unable to do so. The only job she secured, temporarily, involved working at a restaurant, earning $7 per hour, plus tips. The court further found that: (1) Justin did not retain a vocational expert regarding Sandra's employability; (2) Justin presented no evidence as to the amount of income Sandra could earn; (3) Sandra's salary at the family business ($8,666 monthly) was unilaterally set by Justin and not reflective of her earning capacity; and (4) as the only evidence presented regarding Sandra's employment outside of the marriage was her salary of $35,000 to $40,000, her earning capacity would be capped at that amount. None of the court's findings, particularly considering Justin's failure to present evidence to support his claims about the value of Sandra's MBA or her earning potential, was against the manifest weight of the evidence. The

court reasonably considered the evidence relating to both parties' respective sources of income and future employability when it divided the estate. In any event, this factor certainly does not suggest that Justin should receive a disproportionate share of the estate.

¶ 37    6. Apportionment as Related to Maintenance, Future Acquisition of Capital, and Tax Consequences: Sections 503(d)(10)-(12)

¶ 38    For the remaining section 503(d) factors, Justin argues as follows. First, with respect to section 503(d)(10) (maintenance), Justin argues that, because the property apportionment is in addition to maintenance, the factor favors him. Specifically, he notes that Sandra received an indefinite maintenance award of $32,500 monthly, as well as retroactive maintenance in the amount of $465,494. He contends that her needs are covered by maintenance and, therefore, he should receive a disproportionate share of the marital estate. Next, with respect to section 503(d)(11) (acquisition of capital), Justin argues that, while his significant income allows him the opportunity to acquire capital assets and income in the future, Sandra also has a substantial opportunity to do so, as her needs will all be paid from his maintenance, she has more than $300,000 in annual passive investment income, and she can reinvest that income each year. Justin asserts that, in contrast, his short-term ability to acquire capital assets and income is reduced by his other obligations under the judgment. Finally, with respect to section 503(d)(12) (taxes), Justin asserts that Sandra's assets will primarily grow tax free or are after-tax assets, while he has *de minimus* assets other than his business interests, the income from which are all taxed. He contends that if he sells a business, he will pay capital gains tax on the sale and, therefore, for him to access the assets the court awarded him, he will have to pay taxes. He argues that section 503(d)(12) favors him.

¶ 39    None of these arguments reflects that the court abused its discretion or that Justin should receive a disproportionate share of the estate. The court found that Sandra's earning capacity was

limited and maintenance was appropriate, that the property award would be apportioned in consideration of the maintenance award, and that Justin has "a far superior ability to earn income and acquire significant assets in the future." As Sandra points out, Justin cites no authority for the assertion that, because she is to receive maintenance, he should receive more of the marital estate. Indeed, the court was not required to diminish her property award simply because it was awarding maintenance; rather, the court reasonably considered the apportionment of property as it related to maintenance and factored Sandra's property award into her maintenance award such that to reduce the property award would suggest a countering increase in maintenance. Indeed, the court noted that Sandra had requested that the estate be divided 70/30 in her favor, but, as it was awarding her indefinite monthly maintenance, in addition to other factors, a 50/50 division was appropriate. Finally, as both parties pay taxes on their assets and income, even if at differing times, we do not agree that the court's findings were unreasonable.

¶ 40                                    7. Equal Division of the Estate

¶ 41     Finally, Justin argues that the court's overall allocation of the marital estate was an abuse of discretion and inequitable. He asserts that the inequitable nature of the judgment is best demonstrated by his "objective inability" to comply with it. For example, Justin asserts that, although the court ordered him to pay Sandra, within 30 days, $395,138.51 for contribution towards attorney fees and costs, he did not receive that amount in liquid assets (his net cash, he asserts, totaled only $236,587). Justin notes that he "could not pay the contribution award without selling illiquid assets like real estate of at least $159,000, which comes with transaction costs and is difficult to do in a short period of 30 days." Further, the court ordered that, in addition to the assets and cryptocurrency she received, Sandra is to receive, within six months, an adjustment payment of $1,314,600. This, too, Justin asserts, is not possible without selling assets. However,

- 14 -

he states that even if he sold his real estate and motor vehicles, he could not make the adjustment payment without selling one or more businesses. In turn, his income would decrease, such that he could no longer pay the required maintenance. Thus, Justin concludes that, because he cannot comply with the judgment, the court's overall division is an abuse of discretion.

¶ 42　Justin's arguments boil down to the suggestion that, because his bad conduct resulted in certain contribution and sanction awards, he should receive *more* of the marital estate. Frankly, and demonstrated in our discussion of the preceding factors, it was eminently reasonable for the court to effectuate a 50/50 division of the marital estate, *despite* Justin's conduct and as required by section 503(d), which demands consideration of all factors, irrespective of conduct. Justin claims that his inability to pay is not speculative and reflects basic arithmetic. However, we note that, even if Justin, who the court found lacked *any* credibility, truly believes that complying with the judgment will be challenging, his arguments implicitly concede that it is not that he *cannot* comply with the division, it is that he must make various decisions, including possibly selling assets, on how best to do so.

¶ 43　Finally, Justin argues that the court did not actually achieve a 50/50 division of the estate. He summarizes that the court found the marital estate had total assets of $13,333,908, including the cryptocurrency ($2,160,431) and his dissipation ($838,256). The court awarded Sandra $5,586,738, plus 85% of the cryptocurrency for a total amount of $7,423,104, which is around 55% of the entire marital estate, while he received $5,910,802, "approximately $1.5 million less than Sandra." Justin further contends that the court did not consider the mortgage on the South Carolina property; although the court ordered Sandra to pay the mortgage and it ordered him to execute and tender a quitclaim deed transferring his interest in the property to Sandra, it should have also ordered her to remove Justin from the mortgage and liability thereof. In addition, he

argues, Sandra should be responsible for half (about $9,835) of a 2022 tax liability on that property "incurred in the production of Justin's income, from which Sandra and the marital estate benefitted."

¶ 44    Justin's arguments ignore several points. First, he cites *In re Marriage of Awan*, 388 Ill. App. 3d 204 (2009), for the proposition that, like marital assets, marital debts must also be distributed equally. However, here, the court found that Justin violated court orders when he refinanced the mortgage on the South Carolina property in a manner that decreased its value and caused "a significant increase in the monthly mortgage payment" that increased the interest rate. It further found that, for various periods, he failed to pay the mortgage, real estate taxes, and association fees. The division of assets and debts rests in the court's sound discretion, and an abuse occurs only where no reasonable person would adopt the court's view. *Id.* at 213. Given the foregoing, the court's handling of the South Carolina residence was not unreasonable.

¶ 45    Second, as part of the 50/50 division of marital property (the court attached to its decision a chart detailing its equal division of the estate), the court awarded Sandra a total of 85% of the cryptocurrency. However, the additional 35% of the cryptocurrency that Sandra received (beyond the 50%) was not part of the division, but, rather, was a sanction for Justin's attempts to intentionally mislead Sandra and the court about the existence of the cryptocurrency accounts. The court stated that, "although [it] is equally dividing the marital estate, as a sanction for his conduct in failing to disclose over a million dollars in cryptocurrency, the court is awarding 85% of that asset to Sandra." Indeed, in denying Justin's motion to reconsider, the court noted that, contrary to Justin's claim that Sandra received $395,138.51 more than him, the balance sheet exhibit attached to the judgment demonstrated that it effectuated an equal division of the marital estate, excluding cryptocurrency, and that the $395,138.51 attorney fees award was not an asset. "As set

forth in Exhibit A of the Judgement, each party was awarded $5,631,903 in marital assets, which is an equal division of the marital estate (excluding cryptocurrency)."

¶ 46    As Justin notes, the court's division of the marital estate should not be considered piecemeal, but, rather, evaluated in the context of the *whole judgment* to determine if the distribution was made in "just proportions." *In re Marriage of Steele*, 212 Ill. App. 3d 425, 432 (1991). "Whether an apportionment was just depends on whether it was equitable in nature, and equitableness does not dictate that the division must be equal; however, an award splitting the property into equal halves will not be overturned on that basis alone." *Id.* In sum, Justin has failed to demonstrate that the court's overall division of the marital estate was unreasonable.

¶ 47                    B. Justin's Appeal: Dissipation Findings

¶ 48    Justin next challenges the court's dissipation findings. He contends that many of the expenditures that the court characterized as dissipation were consistent with and included in Brend's analysis of the parties' lifestyle. For example, charges for clothing, dining out, entertainment, and travel were part of the parties' lifestyle, yet, the court found them to be dissipation, even though it adopted Brend's lifestyle analysis, which included some of those very expenses. Justin argues that it is axiomatic that an expense that is included in the "lifestyle" of both parties cannot be dissipation. He claims, "any expenditures found to be dissipation cannot be part of Sandra's lifestyle for purposes of awarding her maintenance."

¶ 49    Justin also challenges the court's dissipation findings regarding withdrawals from a Bank of America account in the name of one of the parties' businesses, Kinetic Consulting. He alleges that many expenses were not properly found to be dissipation (again, because they were included in lifestyle (such as designer purses, a watch, payments for a leased BMW, and around $12,000 in travel expenses)) and that he is being charged twice for the same transactions (because the

- 17 -

expenses were considered dissipation but also reduced the value of the businesses awarded to Justin, where the cash transfers out of the business reduced the value in Brend's valuation).

¶ 50    Finally, Justin argues that the court improperly found $35,442 in furnishings that he purchased was dissipation, where he had to buy furniture for his residence and, by the time the court found dissipation the furniture was 12 to 25 months old, was used, and had decreased in value.   Thus, although the court stated that it could either find the furniture charges to be dissipation, or could include them in Justin's assets, which would have the same effect, Justin claims the court erred because, again, some of the purchases were included in Brend's lifestyle analysis and there was no evidence about the current value of the furniture.   Justin argues that the court abused its discretion and that the case should be remanded for a determination of the amount of dissipation, if any.

¶ 51    Justin's arguments do not reflect that the court abused its discretion.   Indeed, the question is not whether spending is consistent with lifestyle but, rather, whether "such spending was for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown." *In re Marriage of Hagshenas*, 234 Ill. App. 3d 178, 195 (1992).   Justin is concerned with expenses being considered *both* dissipation and lifestyle expenses, emphasizing his position that, if expenses were made for the benefit of only one party unrelated to the marriage, such that they constitute dissipation, then they should not be included in the standard of living of the parties.   We disagree, as dissipation and lifestyle inquiries concern separate questions and time periods.   As Sandra notes, a lifestyle analysis helps to determine what the parties spent during a period of their marriage, but it does not determine whether a particular expenditure was made for a marital purpose.   Here, Brend analyzed what the parties historically spent during their marriage.   However, the court expressly found that, once the

marriage was experiencing a breakdown, some of Justin's spending constituted dissipation because it included spending on his girlfriend, a "wedding" in Hawaii, and other purchases that no longer benefited the marriage. Although Justin claims that he has identified over $30,000 in expenses included both in Brend's lifestyle analysis and Sandra's dissipation claim that cannot be both without "double counting," he does not reconcile that the funds he spent might have been for the benefit of the marriage before the breakdown but shifted into dissipation thereafter. It is interesting that Justin cites *In re Marriage of Davis*, 215 Ill. App. 3d 763, 777-78 (1991), for the proposition that "maintaining the lifestyle established during the marriage does not support a claim of dissipation," when the court in *Davis* made that statement while expressly noting that the husband used the challenged funds for trips with the children and vacations, kept meticulous records of every expenditure, and that it was not a case where he "spent funds during the marriage on a girlfriend," "on other non-family purposes," or "on secreted funds in other places without explanation." *Id.* Rather, he "used the account for family expenses, including some of his own which would have been part of the family's expenses, to benefit *all*." (Emphasis added.) *Id.* at 778. Here, in contrast, the court found almost the exact opposite with respect to Justin's expenditures.

¶ 52    In addition, Justin's arguments about the business account seem to concern the fact that he took money from a business and secreted it away to an undisclosed account. Even if those withdrawn funds (which constituted marital funds when withdrawn) lowered the business value, he was given the business *and* used the funds he withdrew, which is why the court considered the withdrawal in its dissipation figure. This was reasonable. Regarding the furniture, the court noted that, whether it considered it an asset or dissipation had the same net effect on the judgment balance sheet and, since Justin failed to rebut Sandra's claims, it classified it as dissipation. It further noted

that the furnishings Sandra took from the former marital residence were old, in poor condition, and had limited-to-no value, as well as the fact that Justin could have requested to take some of those furnishings when he returned to the marital residence at least three times, but chose not to. Unlike in *Hagshenas*, 234 Ill. App. 3d at 196, where the husband testified in specific detail about his expenditures, and the court found credible and relied upon that testimony, here, the court found it *could not* rely on Justin's testimony if not supported by documentary proof, due to his utter lack of credibility. His arguments are unavailing.

¶ 53 Further, and relatedly, Justin did not affirmatively prove that the referenced expenses served a marital purpose. The parties *stipulated* both that Sandra had established a *prima facie* case with respect to all of her dissipation claims, *and* that Justin failed to produce any documentation supporting his testimony refuting the alleged dissipation. Thus, the court was left with Justin's unsupported testimony, which it found completely lacked credibility, and, for that reason, that it would not rely solely on Justin's word without documentary proof. It noted that, even though a consistent issue at trial was Justin's alleged inability to recall information (such as undisclosed bank accounts and information related to his Hawaii "wedding"), he testified regarding most transactions listed on Sandra's dissipation claims (which went back multiple years) based solely on his memory and "without introducing into evidence a single supporting document even though he acknowledged on adverse exam that supporting documents existed." In sum, Justin has not established the court's dissipation findings are against the manifest weight of the evidence.

¶ 54 C. Justin's Appeal: Attorney Fees Contribution Award

¶ 55 Justin argues next that the court erred in its contribution award toward attorney fees and costs. He claims that the court miscalculated the amount of fees and ordered him to pay more than he owed. Further, he claims that the contribution award was an abuse of discretion, as the court

should have found equitable an equal division of attorney fees and costs, consistent with its 50/50 division of marital property. Finally, he argues that the court did not expressly state which fees were awarded pursuant to section 503(j), versus section 508(b), of the Act, but it stands to reason that the fee award to Sandra was, in large part, in the nature of a section 508(b) award. While Justin acknowledges that such an award was mandatory, in light of the court's findings concerning his conduct, he asserts that the court's discretion was limited to *reasonable* fees and, here, there was no evidence that the fees were reasonable. He argues that Sandra did not produce billing statements or testimony to establish the reasonableness of the section 508(b) fees, and, thus, his due process rights were violated by awarding attorney fees without evidence establishing those fees and their reasonableness.

¶ 56     The court determined that $739,852.29 in attorney and expert fees and costs had been paid from liquidated marital assets, and an additional $494,635.71 had been paid from the marital businesses that were ultimately awarded to Justin. The court also found that a contribution award to Sandra was warranted under section 503(j), given the duration of the marriage, her contributions to the marriage, Justin's superior earning capacity and ability to acquire future assets, and his dissipation of marital assets. Moreover, the court determined that a contribution award was appropriate under section 508(b), due to Justin's misconduct, which needlessly increased the costs of the litigation. As previously mentioned, the court dedicated numerous pages of the judgment to its specific findings concerning Justin's egregious (and potentially criminal) conduct. Ultimately, the court found that Justin should be responsible for 75% of the attorney and expert fees and costs paid from the liquidated marital assets, except for the payment to Brend, whose fees were equally divided. After deducting Sandra's 50% share of Brend's fees from Justin's 75% share of the remaining fees paid from liquidated marital assets, the court ordered Justin to pay Sandra

$395,138.51 as a contribution award. Neither party challenged the contribution findings in their postjudgment motions.

¶ 57    Justin's arguments do not reflect that the court's contribution findings were against the manifest weight of the evidence. Further, the terms or methods for calculating the contribution figure were within the court's discretion. The court's finding that Justin should contribute to Sandra's fees was thoroughly and eminently reasonable, given its findings regarding Justin's conduct that unnecessarily increased those fees. His suggested recalculation, which would alter his obligation to only $6,438, not only fails to establish how the court abused its discretion, it is clearly disproportionate to the court's findings as to the egregious nature of his conduct. Justin also misrepresents the record, where he claims there was no evidence presented for the court to assess the reasonableness of Sandra's fees; indeed, he acknowledges that an attorney fees summary was attached to Sandra's petition for contribution. However, he argues that no billing statements were introduced into evidence and, thus, when Sandra agreed to waive a hearing on the contribution claim, she waived her opportunity to satisfy her burden to present evidence supporting the reasonableness of the fees. We disagree. Both parties waived their right to an evidentiary hearing on the contribution claims, thereby authorizing the court to rule on those claims based on the fee petitions, arguments, and trial evidence. The court's contribution decision will not be disturbed.

¶ 58                              D. Justin's Appeal: Maintenance Award

¶ 59    Justin argues that the court erred in its maintenance award for four overarching reasons: (1) the court's findings regarding the marital lifestyle and Sandra's needs were inaccurate and against the manifest weight of the evidence; (2) the court failed to properly consider Sandra's

income; (3) the court erroneously considered only two years of Justin's income against four years of the family's expenses; and (4) the court should not have awarded retroactive maintenance.

¶ 60    As to lifestyle, Justin asserts that Brend's lifestyle report included expenses for both parties and the children for a four-year period, 2019 to 2022, and concluded that average yearly family expenses totaled $435,301 and average monthly expenses totaled $36,275. Justin notes that the report did not separate Justin's spending from Sandra's, nor spending for the parties' emancipated children. As such, Justin contends that the analysis exaggerated the lifestyle enjoyed by the parties and Sandra's needs. He asserts the court's findings were against the manifest weight of the evidence, where it found, for example, that certain expenses, such as a mortgage, could not be divided in half because one could not be awarded one half a home, or where it found only a limited amount of Brend's monthly expenses report included Justin's expenses. In addition, he notes that Sandra testified that a portion of her financial affidavit included expenses for the children, her affidavit included monthly expenses for the former marital home that was sold, and that even Brend's report included expenses that no longer exist for the emancipated children and, thus, served to overstate the parties' lifestyle. Moreover, Justin contends that court erred, where it reasoned that Sandra's claimed expenses did not include health insurance or savings components, but the court heard no testimony as to the cost of Sandra's health insurance premiums or evidence as the parties' routine savings, and that it erroneously relied on *In re Marriage of Kusper*, 195 Ill. App. 3d 494 (1990), because the parties in that case lived frugally, which allowed them to save for the future, whereas, here, the parties lived a lavish lifestyle. Justin contends that "[e]ither the lifestyle is lavish and reflects the parties' spending, or is frugal and reflects the parties' savings, but applying both considerations to maximize a maintenance award is inequitable and an abuse of discretion." Finally, he contends that the court incorrectly found that the parties enjoyed three

- 23 -

residences, where other people rented or otherwise paid to use one of the properties and, thus, it should not be included as part of Sandra's lifestyle for maintenance purposes.

¶ 61    In awarding maintenance, the court thoroughly considered the factors set forth in section 504 of the Act.  Preliminarily, the court did not simply adopt Brend's analysis; it set Sandra's maintenance figure at $4,000 *less* than the lifestyle amount Brend calculated.  We also note that the figure it set, $32,500, was *less* than the amount it found listed on *Sandra's* affidavit ($38,962) as necessary to maintain the lifestyle of the marriage.  The court explained that, although the lifestyle report was based on the lifestyle of the family, it considered the expenses listed on each party's financial affidavits (it recited Justin's claimed figure as $58,308), Brend's analysis, as well as other trial evidence (including the values of retirement and investment accounts) in determining the lifestyle of the marriage and needs of each party.  To the extent that Brend's analysis included expenses for the entire family, not just Sandra, the court considered that it had *not* included other expenses that Sandra would incur, such as retirement savings, health insurance, and a higher mortgage on the South Carolina property as a result of Justin's conduct in violating court orders. We also disagree with Justin's reliance on *Kusper*, to the extent he suggests only frugal marriages can have savings considered in setting maintenance, while lavish ones do not.  As Sandra notes, this is obviously a false dichotomy and "spending and saving are not mutually exclusive where there is enough income to do both," as the court found was the case here.  The evidence of multiple retirement accounts supports the court's finding that the parties saved during their marriage.  The court also addressed and rejected Justin's argument when ruling on Justin's motion to reconsider. Thus, it is evident that the court meaningfully and reasonably considered the evidence and arguments concerning the parties' monthly historical spending in determining the marital lifestyle figure for purposes of setting Sandra's maintenance.

¶ 62    As for income, Justin argues that the court stated that it considered Sandra's imputed income and the income she could earn from investments, yet it merely made the statement without allowing that consideration to impact the maintenance ruling. Further, he contends the court justified its decision by relying on Potter's conclusions and testimony about when Sandra would exhaust her assets before her life expectancy, but it ignored that Potter's other assumptions that contributed to his conclusions varied "wildly" from those elsewhere in the court's ruling.

¶ 63    The court's judgment, as Justin concedes, expressly considered Sandra's imputed income in its award, stating, "[t]he court finds that a maintenance award of $32,500 combined with her imputed income and award of assets will allow Sandra to remain in the lifestyle of the marriage." The court also addressed and rejected this argument in ruling on Justin's motion to reconsider. It stated that, regarding Justin's assertion that the court failed to include Sandra's imputed income in its maintenance calculation, he was simply incorrect and that the court considered Sandra's earning capability as part of its determination of the maintenance amount. Further, the court noted that Justin did not present any evidence to *rebut* Potter's findings regarding potential investment earnings, and it also noted that it considered the assets awarded, when they could be accessed, and income that could be earned on each type of asset, when setting the maintenance award. In addition, the court's findings make clear it used Potter's assessment as a reference, but it did not adopt it wholesale. Justin simply fails to establish the court's findings were against the manifest weight of the evidence.

¶ 64    Next, Justin notes that Brend's report assessed Justin's average income over two-year, three-year, four-year, and five-year periods. For the parties' historical lifestyle, Brend used a four-year period. Justin contends that the court abused its discretion in "cherry-picking" the two-year monthly income average ($102,470.16 for years 2021 and 2022), which were the highest two years

of income, and the four-year monthly lifestyle amount ($36,275 from 2019 to 2022). Justin contends that there was sufficient evidence of his income such that the court should have used a three-year average for both income and lifestyle (which he asserts would have shown $75,230 in average monthly income and $34,159 in monthly lifestyle spending) for consistency, uniformity, and an equitable result.

¶ 65 Again, the court addressed and rejected this argument in ruling on Justin's motion to reconsider. The court noted that it was tasked with using the best evidence available to determine the historical lifestyle of the parties, as well as Justin's current income. Although some courts, as Justin notes, have used a three-year period to determine average income (see, *e.g.*, *In re Marriage of Freesen*, 275 Ill. App. 3d 97 (1995); *In re Marriage of Elies*, 248 Ill. App. 3d 1052 (1993)), he acknowledges that courts have discretion in averaging a party's income and that a two-year average may be appropriate (see, *e.g.*, *In re Marriage of Gabriel*, 2020 IL App (1st) 182710) when the court "lacks reliable information" on a party's income to consider additional years. Here, the court expressly found its "task was further complicated by Justin's lack of credibility and history of running personal expenses through his business." The court agreed with Potter that, after Justin filed for divorce in 2022, it was expected that expenses for that year would have been modified and inaccurate. For example, again, in the weeks following his March 2022 dissolution petition, "Justin tried to conceal over a million dollars in cryptocurrency." The court felt it appropriate to use a four-year average for expenses and, in fact, according to Potter's report, the court determined that a two-year or three-year average would have reflected higher lifestyle expenses. Finally, the court found that, based on the nature and variability of Justin's income, a two-year average more accurately reflected his current income. We do not find unreasonable the court's decision here to

consider a four-year period in trying to determine the amount of money the parties spent during the course of their marriage, but a more recent two-year period to assess Justin's current income.

¶ 66    Finally, Justin contends the court erred in ordering retroactive maintenance for the period March 2022 through April 2024, where it (1) should not have made it retroactive to a period preceding Sandra's March 20, 2023, motion to set temporary support, citing *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 658-59 (2008), (2) failed to credit Justin for all of the expenses he paid on Sandra's behalf (such as approximately $20,000 per month in living expenses and mortgage and tax payments beyond the monthly maintenance payments), such that the retroactive award should be reduced by $226,107, and (3) should have awarded the retroactive maintenance from the marital estate, not from Justin's post dissolution share of the estate, and the payment should be reduced to $232,747, or half the awarded amount, to account for the fact that the retroactive maintenance should have come from the estate of which Sandra received 50% thereof.

¶ 67    We disagree. The court noted that Sandra's motion to set support *requested* that the court grant retroactive maintenance back to the date that she filed her counter-petition for dissolution in March 2022. The court found that Justin had been paying Sandra inadequate support since commencing the proceeding (*i.e.*, $8,666 monthly, and, then, $13,000 monthly), based on the lifestyle of the parties compared to the amount of maintenance that he had paid during the pendency of the proceedings, such that a retroactive award was appropriate. It expressly stated that it would not be equitable to award the entire difference between maintenance paid and maintenance awarded without crediting Justin for expenses he paid during that period and that it did so. Overall, the court's findings were simply not unreasonable. The decision in *Heroy* is not applicable, as the court there simply affirmed the trial court's decision to award retroactive maintenance back to the date it was requested. *Heroy*, 385 Ill. App. 3d 659. Although Justin

asserts the court did not credit him for other payments he made on the family's behalf while also paying temporary maintenance, the court expressly considered and credited him for the expenses it found properly reimbursable based on the evidence. Also, Justin suggests the retroactive maintenance should have been paid as a lump sum from the marital estate, but, in its discretion, the court determined that breaking the retroactive payment into 96 monthly payments, rather than one lump sum, was appropriate. The court's decision was not unreasonable.

¶ 68                                E. Justin's Appeal: Sanctions

¶ 69    Finally, Justin argues that the amount of the court's sanctions award was egregious and went far beyond the purposes for which sanctions are imposed. Justin asserts the "punishment must match the crime." He claims, for example, Sandra was not surprised or prejudiced with respect to the cryptocurrency, as it was addressed well in advance of trial, he and Sandra had discussed it, and "Sandra used reasonable diligence to discover" it. He asserts that his failure to disclose it was not in bad faith and that he "inadvertently" left it off the 2022 financial affidavit and answers to interrogatories. Further, Justin recognizes that a sanction concerning the Hawaii "wedding" was not an abuse of discretion, but, in the end, Sandra received the discovery she sought, the court was able to conduct a trial on the merits, and he stipulated that the "wedding" expenses were dissipation. Therefore, he extrapolates, the court's sanction served solely to punish him, which he contends is not the purpose of Rule 219(c) sanctions. Similarly, he notes that Rule 137 sanctions are not meant to apply to a party's conduct in court, only the signing of pleadings, and, thus, the court's award was not authorized for violations of other court rules and acts of misconduct. The Rule 137 sanctions were also inequitable and an abuse of discretion, he argues, where Sandra was compensated in the dissipation award for Justin's "wedding" in Hawaii and via contribution to her attorney fees and costs, to the extent she incurred attorney fees to discover

same. Justin argues that a $432,086 cryptocurrency sanction (the difference between an equal division and the court's 85/15 division) for failing to include the cryptocurrency in his interrogatory answers and financial affidavits is egregious, arbitrary, and unreasonable. Also, the contribution award was *prima facie* unreasonable, and it caused him to pay an inequitable amount of fees from his share of the marital estate, particularly where the court heard no evidence or testimony concerning the amount of fees allegedly caused by his failure to comply with court orders or for any increased costs of the litigation. "A reasonable contribution award under [s]ection 503(j) would have been Sandra not owing Justin anything for contribution to fees."

¶ 70   The court sanctioned Justin in three different ways: (1) by awarding Sandra an additional 35% share of the cryptocurrency for his failure to disclose that asset; (2) by ordering Justin to pay contribution toward attorney fees in response to discovery violations, violation of court orders, dissipation, and overall misconduct that needlessly increased the cost of litigation; and (3) a monetary sanction (to be paid to charity) for his willful perjury and interference with the delivery of a subpoena. Although Justin focuses on the "grand total" to argue the sanctions were egregious, each sanction was supported by the court's findings and was not unreasonable.

¶ 71   Justin asserts that his failure to disclose almost $1 million in cryptocurrency, which he moved to "cold wallet" storage accounts almost immediately after filing for divorce, was inadvertent and, essentially, "no harm, no foul," because Sandra figured it out. This argument borders on offensive. The court expressly rejected Justin's suggestion that the failure was inadvertent, and the fact that Brend's team (who was, by the way, being paid for its time by the marital estate), eventually uncovered the asset and confronted him with it, does not render harmless Justin's failure to disclose the cryptocurrency (in two financial affidavits and interrogatory responses). Further, the court imposed this sanction pursuant to section 501(a)(1), which provides,

"If a party intentionally or recklessly files an inaccurate or misleading financial affidavit, the court *shall impose significant penalties and sanctions* including, but not limited to, costs and attorney's fees." 750 ILCS 5/501(a)(1) (West 2022)). The court noted on reconsideration that cryptocurrency is volatile in nature, but it would be inequitable to alter the distribution of a greater share to Sandra simply due to its increased in value prior to the judgment's entry. In fact, the court found that

> "allowing Justin to retain a greater share of this asset would serve to reward him for his conduct. Justin is correct when asserting that this sanction is severe. It is intended to be. Financial affidavits are the foundation of every divorce and family case. Courts must be able to rely on their accuracy and litigants must know that any attempt to deceive the court will result in significant sanctions—as required by [section 501(a)(1)]."

¶ 72 Justin's arguments regarding sanctions related to contribution similarly fail. Again, the court detailed the egregious nature of Justin's conduct that gave rise to the sanctions, which included, in part, actively secreting funds, repeatedly lying under oath, "fraudulently and illegally attempting to intercept Sandra's subpoena" to a Hawaiian hotel where Justin secretly had a "wedding" with his girlfriend, and forcing Sandra and her attorneys to engage in extensive and costly work to discover and remedy the misconduct. Again, his suggestion that, in the end, there was "no harm, no foul," because discovery was ultimately successful, is outrageous and unavailing. The court's sanctions were not premised on Rule 137 or Rule 219(c); rather, they were part of the court's contribution and dissipation awards. Further, the $20,000 payment to charity was not, as Justin contends, ordered as a "punishment," but, rather, the court expressly ordered the sanction to discourage similar behavior in future proceedings. In sum, the court's sanctions awards were far from unreasonable, and Justin's arguments fail.

¶ 73            F. Sandra's Cross-Appeal: Business Funds as Dissipation

¶ 74    Sandra argues that the court's finding that Justin's personal spending of business funds that were "added back" to the businesses' cash for valuation purposes could not be dissipation was against the manifest weight of the evidence. Specifically, Sandra's dissipation notices included a total of $414,476 in charges that Justin made in 2022 on business credit cards. Although the court initially included these expenditures in calculating the total amount of Justin's dissipation, it ultimately subtracted those expenditures from the final dissipation finding. The court reasoned that Brend had "added back" those expenses to the revenues of Justin's businesses for purposes of their 2022 net income valuation because Brend determined that they were personal, not business related, and,

> "[t]o find these expenses were dissipation would result in Sandra being granted an offsetting amount for the value of the companies while also being awarded that amount as dissipation. Since some of these expenses are a component of the value of the companies, there is no diminution of the marital estate's value."

Sandra argues that the court erred because Brend's analysis of past earnings was used to calculate future earning power; they were not to be valued separately as an asset of the company. She asserts that the 2022 earnings that Brend added back for valuation purposes was not retained by the companies as non-operating assets; rather, it represented marital income that was "paid" to Justin in the form of business credit card charges that he already spent and, therefore, dissipated. Counting the charges as dissipation would *not* constitute "double dipping," Sandra emphasizes, because Brend did not add those charges to the company's net income as an existing asset with a separate dollar value, but, rather, simply used them to calculate the company's future cash flows. The funds no longer exist, Sandra notes; "Justin is getting away with spending $414,476 in marital

income that is no longer in those companies or anywhere else in the marital estate." Thus, she contends that the court's exclusion of $414,476 from the dissipation calculation was against the manifest weight of the evidence. Sandra requests a credit of $207,238 in the property award (one half of the $414,476) for the dissipation the court incorrectly excluded in connection with the business valuations.

¶ 75 We reject Sandra's argument. The court reasonably determined that Brend's decision to add back the personal expenses to the business accounts increased the value of the businesses. Then, the court considered the value of all businesses when awarding them to Justin and ensuring that Sandra received the same value in other assets. It noted that, to the extent that the personal expenses were added back "to establish the value of the businesses," they would not also be considered as dissipation, because Sandra was already being granted an offsetting amount for the value of the companies. Sandra argues that the money was not actually in existence as an "asset" of the business, but she nevertheless received the benefit of that "phantom" add back, because the court awarded her assets that equaled the value of the business and other assets that Justin received. Again, the division of the marital estate should not be considered piecemeal, but, rather, evaluated in the context of the *whole judgment* to determine if the distribution was made in just proportions. *Steele*, 212 Ill. App. 3d at 432. Here, the trial court very clearly considered the entire record and all circumstances in attempting to achieve an equitable result for the parties. To pull on one thread of the court's discretionary decision would possibly unravel another. In short, Sandra has not established that the court acted unreasonably, and we will not disturb the court's dissipation finding and alter the asset allocation.

¶ 76                    G. Sandra's Cross-Appeal: Cash Difference/Marital Asset

¶ 77    Sandra argues next that the court's finding that a $552,332 cash difference attributable to the CDL Consultant business was not a marital asset was against the manifest weight of the evidence. Specifically, Sandra notes that the court ordered Brend to "prepare a marital balance sheet as of July 31, 2023, based solely on the trial exhibits previously marked by each party on their exhibit lists." Brend prepared an analysis that included the difference (increase) in each business's cash holdings since the valuation date of July 31, 2023. The court noted that: (1) Justin presented no evidence to rebut that there was anything other than a significant *increase* in the business assets, (2) had there been any evidence rebutting an increase, he could have presented it, particularly after hearing Brend's testimony, but did not, and (3) the increases were appropriate to include in the marital estate. As such, the court added those differences to the judgment, *except* for the CDL Consultant business. The court summarized that CDL Consultant's cash increased $552,332, and, specifically,

        "from -$168,986 (negative) per Brend's report to $383,346 as of July 31, 2023. Notably, the total value of CDL Consultant was only $305,000, and the increase in cash was more than the total value of the business. Brend testified that one of the reasons he did not include the increased cash was because one account that had an increase in cash was an escrow account which 'wasn't really the property or the case [*sic*] of the business, to the best of [his] knowledge,' but was being held on behalf of clients."

¶ 78    Sandra argues that the court should have disregarded Brend's testimony about the purported escrow account, because it was based solely on Justin's uncorroborated testimony and statements to Brend, not on any "trial exhibits previously marked by each party on their exhibit lists," as required by court's order, nor any documentary exhibits in the record. Further, by taking Justin

solely at his word about purported cash in the business's escrow, he was effectively rewarded for failing to respond to Sandra's requests that he produce the business records that would have enabled Brend to determine whether any of CDL Consultant's cash balances were attributable to the escrow accounts. Sandra argues that the court unreasonably rejected her arguments in this regard when, in ruling on her motion to modify the judgment, it stated

> "[b]ased on the testimony at trial regarding the nature and operation of Justin's business, it would stand to reason that he would be holding large amounts of cash in escrow to pay attorneys for legal services. The Court agreed with Mr. Brend that this money was not the property of the business but was held on behalf of others."

Sandra contends the court's finding was pure conjecture, where even Brend stated that he believed part of the cash difference was in a trust account, but he could not say for certain, and there were no business records produced to document the assertion. Sandra claims that, if the court had included on the marital balance sheet the CDL Consultant cash increase of $552,332, it would have increased the adjustment payment Justin owed Sandra by 50% of that amount, and, further, that its reliance solely on Brend's "belief" was unreasonable. Given Justin's "brazen" discovery violations, lack of credibility, and concealment of assets, Sandra contends, it was unreasonable and against the manifest weight of the evidence for the court, in effect, to give Justin the benefit of the doubt regarding whether the $532,332 in cash held in the bank accounts of CDL Consultant, a marital business, was a marital asset. She requests that her share of the marital assets should be increased by 50% of the value of that asset, or $276,166.

¶ 79    Again, we disagree. Clearly, the court was eminently aware of Justin's lack of credibility. Instead, here, it considered Brend's report and credited the portions it found accurate. For example, the court noted and acknowledged that Brend's balance sheet contained some errors and relied on

Justin's representations of documents that were not marked as exhibits. "As a result, and based on the evidence presented, this Court has made several revisions to Brend's balance sheet." The court then proceeded to make findings, including those pertaining to CDL Consultant, based upon its assessment of the record, credibility and accuracy of the evidence, as well as its own understanding of the business operations, that some of the account funds would have constituted escrow funds that did not belong to the parties. We read the court's entire judgment as trying to balance equities, such that it agreed that some funds would presumably be escrow funds and, so, it would not include those for CDL Consultant, while it would include those increases for other businesses. In a case such as this, where the court made painstaking and thorough findings to support its judgment, we simply cannot nitpick and perform a piecemeal dissection of one part of the court's overall equitable consideration of the issues and distribution of assets. "We do not consider the fairness of the distribution of the marital assets on a piecemeal basis but determine if the distribution as a whole is in just proportions." *In re Marriage of Bowlby*, 338 Ill. App. 3d 720, 725 (2003). In sum, we will not disturb the court's asset division, which was not unreasonable.

¶ 80                                    III. CONCLUSION

¶ 81    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 82    Affirmed.